795 A.2d 221

Geir FAGERHUS, et ux.

v.

HOST MARRIOTT CORPORATION, et al.

No. 0726, Sept. Term, 2001.

Court of Special Appeals of Maryland.

April 2, 2002.

528

Brice G. Dowell, Towson, for appellants.

Mark T. Mixter, Baltimore, for appellee, Marriott.

Kristine A. Crosswhite (Lesley Skye Macleod and Cross-white, McKenna, Limbrick & Sinclair, LLP, on the brief for appellees, Communite Realty, et al.), Baltimore.

Argued before DAVIS, ADKINS, RAYMOND G. THIEME, JR. (Retired, specially assigned) JJ.

ADKINS, J.

While running on a fitness trail early on a January morning, Geir Fagerhus, appellant, fell on "black ice," injuring his shoulder. Alleging various acts of negligence, Fagerhus sued

appellees Eleventh Springhill Lake Associates, L.P. ("Eleventh"), the owner of the portion of the fitness trail where he fell (the "property"); Community Realty, Inc. ("Community"), Eleventh's property manager; and Marriott's Greenbelt Hotel Services, Inc. ("Marriott"), manager of the hotel where Fagerhus was staying at the time of his fall.

In this appeal, Fagerhus challenges the grant of summary judgment in favor of all three appellees. In particular, he asserts that the trial court erred in holding, as a matter of law, that Eleventh and Community enjoyed the statutory protection of Maryland's recreational use statute (the "MRUS"), which protects private property owners who allow others to use their land for recreational purposes from liability for injuries arising out of such use. *See* Md.Code (1973, 2000 Repl.Vol.), § 5–1101 *et seq.* of the Natural Resources Article ("NR").

This statute has been "on the books" since 1966, enacted and expanded as part of a national trend toward increasing the amount of land available for recreation. Surprisingly, there is no reported Maryland precedent interpreting it. Applying the language of the MRUS in light of its purpose, we shall hold that the trial court correctly ruled that neither the property owner nor the property manager had a duty to make the trail safe for Fagerhus. In addition, we shall hold that the trial court correctly granted judgment on Fagerhus' claims against Marriott.

## FACTS AND LEGAL PROCEEDINGS

Fagerhus checked into the Greenbelt Marriott Hotel (the "hotel") on the windy, stormy evening of January 28, 1998. Traveling from his home in Malmo, Sweden, he was in town to visit his software engineering company's offices in College Park. He had stayed at the hotel five or six times previously; on those occasions, he had used the fitness trail three or four times. He accessed the asphalt trail by going left outside the reception area.

The one-and-a-half mile trail, which is marked by signs saying "Fitness Trail" posted throughout the course, encircles a commercial area known as the "Capital Office Park."[1] The trail passes through several different parcels of property, including the hotel property, privately-owned commercial property, state-owned property, and city streets. Community, as part of its property management services to Eleventh, inspected the property "[a]bout once a year," usually at the beginning of summer, "when ... doing [its] asphalt concrete work for the rest of the park." It made asphalt repairs in order to fill in holes and keep the trail intact. In managing snow and ice removal for parking lots and walkways, Community never cleared or warned of hazardous conditions on the fitness trail, which its on-site manager did not consider to be a walkway within the meaning of Community's contractual obligations.

Fagerhus, a marathoner, usually went around the trail multiple times in the early morning, trying to run for "more than 45 minutes[.]" Because the trail was not lit, he never ran on it in the dark.

As he was checking in on January 28, Fagerhus considered going for a run, because he was preparing for his second or third marathon that year. It was dark and "pretty late," so he "was wondering should [he] be running or shouldn't [he]." He talked it over with a female Marriott employee in the reception area.

> I asked them [sic] ... if [the fitness trail] was open. And I asked them if—I can't recall exactly the wording—but I asked them if it was safe.
>
> And the reason I asked them that was because ... if I could get mugged or something. You know, I have been

---

1. The commercial parcels in the complex are owned by various partnerships, including Eleventh. Community jointly manages all of these parcels. It has no management responsibilities over any portion of the trail owned by the hotel, which is not located within the complex, and does not pay any money to be a part of it.

warned, as [a] European, that … you shouldn't go anywhere running during nighttime.

So I asked them about that, and they said it was safe, but not lit, was the answer at that time there. So I decided to go running in the morning instead.

When he woke on January 29, Fagerhus saw that there was a "clear weather change from the day before, even going from miserable to great." The day was clear, dry, and "very sunny." At approximately 7 a.m., as the sun was just about to rise, Fagerhus dressed in his running clothes, then "just went down[stairs] and asked the [same] receptionist if the fitness trail was open and safe." "[I]t was sort of a joke from my part, more or less, you know, or casual, because it was sort of a great day out. And that was sort of the last conversation I had with them before I went up [to the hotel room] the day before."

Fagerhus set out on his run. He testified at his deposition that although he cannot recall how many times he had run around the trail, he "was on his final lap," "running quickly" down a "minimal downhill" toward a bend in the path, when "suddenly [his] feet went just straight up in the air[.]" He landed on his right side, severely injuring his right hand, shoulder, hip, and leg. He "checked the surface, and it was absolutely polished with ice …. what [he] would call black ice." The black ice extended over the whole width of the path. During his run, Fagerhus had not seen anything to suggest this slippery condition, so that "[i]t was a complete surprise to [him]."

He returned to the hotel in "extreme pain." He did not report his fall to anyone at the hotel, but instead summoned help from his local office. They went to the emergency room of a local hospital, where Fagerhus was treated and released. Fagerhus changed his plans and flew home the same day. He had surgery on his shoulder on February 9, followed by physical therapy.

Fagerhus and his wife[2] filed suit against (1) Eleventh, which owns the portion of the fitness trail where Fagerhus fell; (2) Community, which manages Eleventh's property as well as other properties making up the Capital Office Park; and (3) Marriott, which manages, but does not own, the hotel, and which employed the person to whom Fagerhus spoke.

In Count I, Fagerhus alleged that Eleventh and Marriott negligently failed to close the trail, make it safe, or warn Fagerhus, even though they "knew or should have known that the fitness trail was not safe and was in a dangerous condition that . . . was not and would not be apparent[.]"

In Count II, Fagerhus claimed that Eleventh and Marriott negligently misrepresented the condition of the trail, by failing to advise him, as a business invitee, that the trail was not maintained or inspected, and leading him to believe that "they had done all things necessary, expedient and prudent to determine that the fitness trail was both open and safe for his use[.]" In addition, "by the posting of signs, by oral and written representations and otherwise," Eleventh and Marriott falsely represented "that the fitness trail was operated by and under the jurisdiction of the Greenbelt Marriott[,]" leading Fagerhus "to reasonably believe that [the hotel manager Marriott] . . . and/or [Eleventh] had responsibility to maintain and render safe the fitness trail when in fact they did not" do so.

In Count III, Fagerhus complained that Community "had a duty to manage, maintain, inspect, . . . [and] apply abrasives or other materials during periods of ice and/or snow accumulation," to make the fitness trail safe, or alternatively, to warn "business invitees and guests of the condition of the fitness trail." He alleged that he was "a third-party beneficiary of" Community's management contract with Eleventh, and that Community directly owed him a duty to make the trail safe or warn him of its condition.

---

2. Count V was a loss of consortium claim against all three defendants, on behalf of Fagerhus and his wife.

In Count IV, Fagerhus asserted that Eleventh, as the property owner, "owed a duty to ... business invitees" such as Fagerhus to inspect the trail, and "to render [it] ... safe and fit to use," or to "warn potential users ... of the potential dangers[.]"

Eleventh and Community jointly moved for summary judgment, arguing, *inter alia,* that they had no duty to inspect or make the trail safe for Fagerhus' recreational use, or to warn him of icy conditions. Marriott also moved for summary judgment on the grounds that it did not own or maintain the portion of the trail where Fagerhus fell, and that, as a matter of law, the alleged statements of its employee did not constitute an actionable misrepresentation.

Fagerhus opposed the motions. He offered, *inter alia,* an affidavit indicating that the patch of black ice formed as a result of a natural and predictable drainage pattern flowing downward from an adjacent grassy slope onto the fitness trail.

At the end of the hearing on both motions, the trial court entered summary judgment in favor of Eleventh, Community, and Marriott. It held that "the fitness trail does fit into" Maryland's recreational use statute. The court reasoned that, as owner of the property, Eleventh had no duty to make it safe for Fagerhus' recreational use, and, as the owner's property management agent, Community could claim the same statutory protection. As to Marriott, the court concluded that it "had no duty because there was a lack of relationship" in that it "had no ownership interest whatsoever" in the property where Fagerhus fell. In addition, the court determined that Marriott did not misrepresent that the trail was "safe" in the sense that it did not have ice.

Fagerhus appeals the judgments, raising two issues, which we have reordered and rephrased:

I. Did the trial court err in holding that, under Maryland's recreational use statute, Eleventh and Community had no duty to Fagerhus?

II. Did the trial court err in holding that Marriott had no duty to Fagerhus because there was a dispute of fact

as to whether Marriott had assumed responsibility for its guests' use of the fitness trail and/or negligently misrepresented its conditions to Fagerhus?

## DISCUSSION

### Standard For Review Of Summary Judgment

■■■■ "An appellate court's review of the grant of summary judgment involves the determination whether a dispute of material fact exists, and 'whether the trial court was legally correct.'" *Taylor v. NationsBank, N.A.*, 365 Md. 166, 174, 776 A.2d 645 (2001) (citations omitted). If the case presents a clear legal issue, which does not require the trial court to resolve motive, intent, credibility, or disputed facts and inferences, then the court may determine liability as a matter of law on a motion for summary judgment. *See Nicholson Air Svcs. v. Bd. of County Comm'rs*, 120 Md.App. 47, 62, 706 A.2d 124 (1998). We review *de novo* the trial court's legal conclusion that a defendant is entitled to summary judgment. *See Matthews v. Howell*, 359 Md. 152, 162, 753 A.2d 69 (2000).

### I.

### The Trial Court Correctly Applied Maryland's Recreational Land Use Statute

Fagerhus argues that the trial court erred in applying Maryland's recreational use statute to "completely absolve" Eleventh and Community from liability. In support, he contends that construing the MRUS in this manner improperly "abrogate[s] traditional premises liability law," under which a property owner must take reasonable care to make his premises safe or to warn of dangerous conditions.

Although we agree that applying the MRUS to Eleventh and Community effectively exempts them from traditional premises liability standards of care, we do not agree that the trial court's decision to do so was error. To the contrary, the language of this subtitle and its legislative history make it clear that the legislature intended to carve out an exception

for precisely the circumstances presented by this case.[3] We explain.

When we construe a statute, we ask what the legislature intended. *See City of Baltimore v. Ross*, 365 Md. 351, 361–62, 779 A.2d 380 (2001). The words of the statute are the primary source of information for that inquiry. *See id.* at 362, 779 A.2d 380. We also refer to "external manifestations of intent or general purpose available through other evidence," including "a bill's title and function[,] paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Williams v. City of Baltimore*, 359 Md. 101, 116, 753 A.2d 41 (2000)(internal quotation marks and citation omitted).

The MRUS subtitle was enacted in 1966. Section 5–1103 of the MRUS plainly states:

> Except as specifically ... provided in § 5–1106[4] ..., an owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition ... on the premises to any person who enters on the land for these purposes.

NR § 5–1103; *see former* Md.Code (1957, 1966), Art. 66 § 410L; 1966 Md. Laws, Chap. 292. Even if a land owner "invites" the use of its property for recreational purposes, as

---

**3.** Fagerhus and the trial court incorrectly believed that there is no legislative history to consult. As Eleventh and Community point out, and duly set forth in their appendix, there is a relative wealth of legislative material to aid in our interpretation of the MRUS.

**4.** The only exceptions to this statutory limitation on premises liability are for "willful or malicious failure to guard or warn against a dangerous condition ... or for injury suffered where the owner of the land charges the person who enters or goes on the land for any recreational or educational use." Md.Code (1973, 2000 Repl.Vol.), § 5–1106 of the Natural Resources Article ("NR"). The parties agree that none of these exceptions is at issue in this case.

long as it does so without charge, its actions are not measured by traditional premises liability standards.

> [A]n owner of land who either directly or indirectly invites or permits without charge persons to use the property for any recreational or educational purpose . . . does not by this action:
>
> (1) Extend any assurance that the premises are safe for any purpose;
>
> (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or
>
> (3) Assume responsibility for or incur liability as a result of any injury to the person . . . caused by an act or omission of the person.

NR § 5–1104.

We need not speculate whether the legislature intended the MRUS to limit traditional premises liability standards, because it codified an intent to do so.

> The purpose of this subtitle is to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public for any recreational and educational purpose *by limiting the owner's liability* toward any person who enters on land, water, and airspace above the land and water areas for these purposes.

NR § 5–1102(a)(emphasis added).

The question, then, is whether Eleventh and Community were entitled to judgment as a matter of law on the basis of this statutory limitation on premises liability. The MRUS covers "land," which, as defined, explicitly includes "paths [and] trails," when the land is used for "recreational purpose[s]." *See* NR § 5–1101(d). There is no dispute that such purposes include the recreational jogging at issue here.[5] The

---

**5.** " 'Recreational purpose' means any recreational pursuit." NR § 5–1101(f). Until 2000, the legislature used a "listing" approach to defining "recreational purpose." Among the enumerated recreational pursuits was "jogging." *See former* Md.Code (1973, 1983 Repl.Vol., 1989 Cum.Supp.), § 5–1101(f) of the Natural Resources Article; 1989 Md.

crux of the issue in this case is whether Eleventh and Community are the type of property "owners" that the legislature intended to insulate under this subtitle.

## A.

### The Landowner

■ With respect to Eleventh, the answer is clear. The MRUS defines "owner" broadly, as "the owner of any estate or other interest in real property, whether possessory or nonpossessory, including the grantee of an easement." NR § 5–1101(e). The statute protects Eleventh, because it is undisputedly the fee simple "owner" of the property where Fagerhus fell.

■ We reject Fagerhus' contention that the benefits of the MRUS extend only to landowners who are "public entities." There is nothing in the language of the definition of "owner" or of any other provision in the subtitle to support such a substantial restriction. To the contrary, the legislative history of the subtitle reveals that, from its inception, the MRUS has been targeted specifically to private property owners. Maryland's statute was enacted in response to a 1965 recommendation by the Council of State Governments (the "Council"), and modeled on its "suggested state legislation." The Council explained the public benefits of exempting private property owners from traditional premises liability duties.

Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public.

The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. Where the owners of private land suitable for recreational use make it available on a

---

Laws, Chap. 640 (amending definition of "recreational purpose" to provide that it "includes ... jogging [and] marathon racing"); 2000 Md. Laws, Chap. 296 (amending definition of "recreational purpose" to current text).

business basis, there may be little reason to treat such owners and the facilities they provide in any way different from that customary for operators of private enterprises. However, in those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.

Th[is] suggested act ... is designed to encourage availability of private lands by limiting the liability of owners to situations in which they are compensated for the use of their property and to those in which injury results from malicious or willful acts of the owner.

In 1966, Maryland's legislature adopted the MRUS, joining a nationwide trend toward increasing recreational and educational opportunities.[6] *See* 1966 Md. Laws, Chap. 292. The subtitle was entitled "Public Recreation On Private Land" until 2000, when the legislature amended the MRUS to extend its protection to land owned by local governments. *See* NR § 5–1105.1 (sections 5–1103 and 5–1104 apply to "a unit of local government as an owner of land"); 2000 Md. Laws, Chap. 352, § 2.

---

6. Currently, all 50 states have some form of statutory limitation of liability for private land owners who make their property available for recreational use. *See* Dep't of Legislative Svcs., Fiscal Note, H.B. 296 (revised Mar. 15, 2000); *Robin C. Miller*, Annotation, *Effect of Statute Limiting Landowner's Liability for Personal Injury to Recreational User*, 47 A.L.R.4th 262, § 2[a] (1986).

Fagerhus complains that applying the recreational use statute in cases involving an "implied invitation" to use the property for recreational purposes "flies in the face of the law" governing traditional premises liability claims. He also asserts that the statute covers only licensees, because if the framers "intended for landowners to be shielded from liability from implied invitees the Statute would have said 'an owner of land who impliedly invites person to use property for any recreational purpose' is protected."

We again disagree. The MRUS covers all "non-paying" recreational and educational users, without regard to how they might otherwise be "categorized" under common law. For example, contrary to Fagerhus' contention, a landowner who permits his land to be used for recreational hunting by people he neither accompanies nor supervises is covered by the MRUS. Fagerhus sees the landowner's permission as a direct or indirect invitation to use the property. We view it differently.

When a landowner permits others to use its property for unsupervised recreational activities without charge, the landowner is making available private land for public recreational purposes in precisely the manner that the MRUS is designed to encourage. The promise of the MRUS is that when the landowner does so, it does not take on any duty to the recreational users. Under section 5–1104, then, even a "direct" or "indirect" invitation to use the land for recreational purposes without charge does not "[e]xtend any assurance that the premises are safe for any purpose," does not "[c]onfer upon the person the legal status of invitee or licensee to whom a duty of care is owned," and does not "[a]ssume responsibility for or incur liability as a result of any injury to the person ... caused by an act [or] omission of the person." NR § 5–1104. *See, e.g., Johnson v. Unocal Corp.,* 21 Cal.App.4th 310, 26 Cal.Rptr.2d 148, 152 (1993)(affirming summary judgment against plaintiff injured during company picnic held on property that owner invited others to use for scheduled events); *Peterson v. Midwest Sec. Ins. Co.,* 238 Wis.2d 677, 617 N.W.2d

876, 880 (2000)(affirming summary judgment against plaintiff injured while hunting on property that owners invited nephew to use for hunting, along with any companions he wanted to bring).

Accordingly, we have no trouble concluding that Eleventh was entitled to judgment as a matter of law. We shall affirm the trial court's judgment in its favor.

## B.

### The Property Manager

We turn next to the trial court's holding that, due to Community's contractual duties to manage and maintain the property, Community is entitled to wear the same MRUS cloak that insulates Eleventh from Fagerhus' suit. Fagerhus argues that the trial court erred in holding that the MRUS protects property managers as well as property owners. Community counters that the trial court correctly extended Eleventh's statutory defense to Community because "[a]n entity that is 'in control' of premises is subject to the same liabilities as the owner and the same limited liability afforded to an owner."

This question is not so quickly resolved. We are mindful that statutory derogations of common law liabilities may not be construed so broadly that the "exception swallows the rule." See Azarian v. Witte, 140 Md.App. 70, 95, 779 A.2d 1043, cert. granted, 367 Md. 86, 785 A.2d 1290 (2001). Moreover, we cannot ignore that the language of the MRUS extends its protection only to an "owner," and does not explicitly include property managers within the definition of "owner." See NR §§ 5–1103, 5–1104. Instead, it has defined "owner" as "the owner of any estate or other interest in real property, whether possessory or nonpossessory." See NR §§ 5–1103, 5–1104, 5–1101(e). Because we may not insert new language into the statute, the question is whether a property manager has a nonpossessory "interest" in the property within the meaning of the MRUS.

Community cites *Wagner v. Doehring,* 315 Md. 97, 103, 553 A.2d 684 (1989), for the proposition that under common law, Community's role as property manager would entitle it to assert any defense that Eleventh had in this case. Although that is an accurate statement of the law, we are not persuaded that using common law principles governing premises liability defenses to construe a statute that explicitly abrogates common law principles of premises liability law would be an intellectually honest approach to construing the MRUS.

Instead, we focus our inquiry on the language of the MRUS, viewed in light of its history and purpose. Because the term "interest in real property" is not defined in the statute, we seek to apply its ordinary meaning. *See Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 212–13, 783 A.2d 194 (2001). In doing so, we recognize that statutory terms may have a different meaning in a tort law context than they do in a property law context. *See, e.g., Wagner,* 315 Md. at 103–04, 553 A.2d 684 (the "distinction between property and tort concepts of possession" must be recognized in examining premises liability questions).

It is clear from the legislature's use of the conjunctive phrase "any estate *or* other interest in real property" that an "interest" refers to some interest other than the traditional freehold and leasehold estates in property. The dictionary defines "interest" as "a business, cause, or the like in which a person has a share, concern, responsibility, etc." *Random House Dictionary of the English Language, Unabridged* 741 (1973). In law, an "interest" is "[a] legal share in something; all or part of a legal or equitable ... right in property." *Black's Law Dictionary* 816 (7th ed.1999). Using these "ordinary" meanings, we characterize a contractual right to manage and maintain real property as an "interest" in the property, albeit a nonexclusive one. By virtue of its contractual rights and duties, the property manager has a shared "concern" and "responsibility" in that property.

Construing the term "interest in property" broadly to include the contractual rights to exercise some control over the

real property is consistent with the legislative history of the MRUS. Originally, the Council's suggested legislation defined an "owner" as "the possessor of a fee interest, a tenant, lessee, occupant *or person in control of the premises.*" (Emphasis added.) We view this language as more clearly encompassing a property manager, in that "person[s] in control of the premises" undoubtedly describes those with a contractual duty to manage and maintain the premises for the landowner.

The MRUS used an identical "in control of the premises" definition of "owner" until October 1, 2000. At that time, the current definition using the "any other interest in real property" language was substituted. *See* 2000 Md. Laws, Chap. 352. Bill analyses and comments regarding this amendment establish that it was not made to narrow the scope of the term "owner," but conversely, to "broaden" or "expand[ ] the definition of 'owner' to include an owner of any nonpossessory interest," such as an easement. *See* Environmental Matters Committee, Bill Analysis, Hearing 2/15/00; Dep't of Legislative Svcs., Fiscal Note, H.B. 296 (revised Mar. 15, 2000). Thus, it is clear that the legislature intended that "other interest in real property" would include nonpossessory interests that give a person "control of the premises," even if that control is not the exclusive or primary control usually exercised by owners of a fee or leasehold estate.

Finally, we agree with Community that this construction is the only one that is consistent with the purpose of the MRUS, because it preserves the incentive for property owners to make land available for recreational use. As Community points out, a contrary construction would undermine that goal.

> If a managing agent is held to be more responsible to a recreational user than a landowner, the end result necessarily will undermine the intent and purpose of the [MRUS]. There can be no doubt that indemnity agreements between the landowner and managing agent either exist or will be created in the future to keep the managing agent free from liability. The net effect is to return liability to the landowner. This in turn will serve only to make private landowners again fear liability and prevent them from permitting or

acquiescing in the use of their lands for recreational purposes.

Construing "owner" based on the language of the MRUS, its history, and its purpose, we hold that a property manager with a contractual duty to manage and maintain premises that a landowner makes available for recreational use is an "owner" who is entitled to invoke the protections of the MRUS. Our construction of the MRUS is consistent with case law in jurisdictions that have analogous recreational use statutes. For example, in *Weller v. Colleges of the Senecas,* 261 A.D.2d 852, 689 N.Y.S.2d 588, 589 (N.Y.App.Div.) *cert. denied,* 93 N.Y.2d 817, 697 N.Y.S.2d 564, 719 N.E.2d 925 (1999), a New York court held that a management services company that contracted to maintain the grounds at a private college was an "occupant" within the meaning of a statute using the same "occupant or other person in control of the premises" definition that the MRUS featured until the 2000 amendment. *See also Bourn v. Herring,* 225 Ga. 67, 166 S.E.2d 89, 91–92 (1969) (general manager of dairy farm was an "owner" under statute using "in control of the premises" definition); *Denton v. L.W. Vail Co.,* 23 Or.App. 28, 541 P.2d 511, 516 (1975)(road construction contractors were "owners"); *Albright v. Metz,* 88 N.Y.2d 656, 649 N.Y.S.2d 359, 672 N.E.2d 584, 589 (1996)(contractor who functioned as landfill owner's work crew and agent in managing property was "occupant" of landfill property). In this case, there is no dispute that Community was Eleventh's property manager pursuant to a contract under which Community was obligated to maintain Eleventh's premises. As Eleventh's managing agent for the property, Community had a sufficient interest in the property to be an "owner" under the MRUS. We shall affirm the judgment in favor of Community.

## II.

### The Trial Court Properly Granted Summary Judgment In Favor Of Marriott

Last, but not least or easiest, we review the judgment in favor of Marriott. The trial court correctly

concluded that Marriott cannot claim the protection of the MRUS because it is not an "owner" for purposes of that statute, in that it has absolutely no interest in or control over the portion of the fitness trail where Fagerhus fell. *See* NR § 5–1104. Moreover, the court also correctly held that Marriott's lack of ownership or control means that Marriott had no duty under traditional concepts of premises liability, either to make the trail safe for Fagerhus, or to warn him of its dangerous condition. *See, e.g., Rosenblatt v. Exxon, U.S.A., Inc.,* 335 Md. 58, 77–78, 642 A.2d 180 (1994)(occupier of land does not owe duty to person harmed by use of neighboring land). Rather, the issue with respect to Marriott is whether the court correctly held that Fagerhus could not establish that Marriott negligently induced him to use the fitness trail by using it "as a marketing tool to enhance the message it had exercise amenities for guests," or that it negligently misrepresented that the fitness trail was "safe."

Fagerhus contends that "reasonable minds could differ" as to whether Marriott "impliedly invited [him] to use the trail," because "the desk clerk told [him] the trail was open and safe" and because Marriott "supplied to its guests literature which described the trial and advertised its use by guests[.]" Because Marriott had no duty to Fagerhus under the standards of care governing landowners, we view Fagerhus' claim as essentially one for negligent misrepresentation, *i.e.,* that Marriott's collective statements regarding the fitness trail allegedly induced Fagerhus to use it that morning.

In the absence of some evidence that Marriott represented to its guests that it inspected, maintained, or otherwise had accurate information about the current condition of the fitness trail, Fagerhus cannot establish that Marriott owed him a duty to communicate such information. We see no such evidence in the record presented to the trial court on summary judgment. Despite discovery, Fagerhus notably did not offer any evidence other than his vague recollection that he had seen some Marriott literature advising guests about the existence of the fitness trail. Assuming such literature exists,

as we must on summary judgment, we nevertheless agree with Marriott that hotel literature merely making guests aware of the nearby fitness trail is not sufficient, by itself, to create a duty to provide up-to-the-minute factual reports on its condition. Advising guests about a fitness trail in the vicinity of the hotel cannot reasonably be interpreted as a representation that Marriott regularly inspected the trail each morning for the safety of any guest who might choose to use it in potentially icy weather conditions. For this reason, the evidence that Fagerhus offered regarding the hotel literature did not constitute a representation that the hotel would give guests accurate information about icy trail conditions at any given hour of the day.

We turn, then, to Fagerhus' complaint about the Marriott desk employee's affirmation that the trail was "open and safe." The trial court concluded that Fagerhus' own deposition testimony established that this statement was not a misrepresentation that the trail was "safe" in the sense that there were no icy conditions at any point along its mile and a half length. Fagerhus contends that a reasonable inference could be drawn to the contrary. Although we agree that in theory "reasonable minds" could differ about what the Marriott employee meant when she said the trail was "safe," we cannot ignore Fagerhus' testimony that at the time the clerk made the comment, he understood that it related to his previously expressed concerns about criminal activity on the trail. As he checked in on the evening of January 28, Fagerhus asked whether the fitness trial was "open and safe" during a conversation about the potential for "mugging" along it. At that time, the Marriott employee allegedly replied only that the trail was "not lit." It was not until Fagerhus saw her again the next day, when he appeared fully dressed for running, that the employee used the term "safe." Moreover, she did so only in response to Fagerhus' "joking" question, using the same term he used as he passed by, which repeated the same question he had asked the night before.

It is clear from his own testimony that Fagerhus did not infer from this single word that the Marriott employee was assuring him that he need not be concerned about ice on the trail as he set out for a daybreak run after a wet and windy winter night. Even if "reasonable minds" might have drawn such an inference from the employee's comment, Fagerhus undisputedly did not. At best, he admitted, Fagerhus did not understand what the employee meant when she affirmed that the trail was "safe." Thus, Fagerhus did not offer any evidence raising an inference that the employee "misrepresented" that the fitness trail was safe from ice, or that he relied upon her comment in making the decision to use the trail. Accordingly, we shall affirm the judgment in favor of Marriott as well.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**