REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2175

September Term, 2013

_____

100 HARBORVIEW DRIVE
CONDOMINIUM COUNCIL OF UNIT
OWNERS AND ZALCO REALTY, INC.

v.

PAUL C. CLARK

_____

Wright,
Leahy,
Salmon, James P.
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  July 30, 2015

*Judge Kevin Arthur did not participate, pursuant to Md. Rule
8-605.1, in the Court's decision to report this opinion.

In the multiplex of administrative and trial court actions and appeals involving Appellee/Cross-Appellant Dr. Paul C. Clark—owner of Penthouse 4A in the 100 Harborview Drive Condominium—and Appellants/Cross-Appellees 100 Harborview Drive Condominium Council of Unit Owners ("Harborview" or "the Council") and property manager Zalco Realty, Inc. ("Zalco"), this appeal features the Maryland Condominium Act and the extent to which it compels the production of Harborview's legal and financial records.

On January 16, 2013, Dr. Clark filed a three-count complaint in the Circuit Court for Baltimore City, alleging that pursuant to the Maryland Condominium Act ("MCA"), Maryland Code (1974, 2010 Repl. Vol.) Real Property Article ("RP") §§ 11-101 *et seq.* and Article X of the By-laws of 100 Harborview Drive Condominium, he was entitled to examine and copy "(a) detailed billing reports or supporting documentation for [Harborview]'s legal invoices concerning Dr. Clark, his family, and the Unit; (b) written advice of legal counsel concerning Dr. Clark, his family, and the Unit; and (c) e-mails between [Harborview] and Zalco concerning the financial well-being of the Condominium." In Count I, Dr. Clark sought a permanent injunction directing Harborview and Zalco to produce the documents; in Count II, he requested specific performance on his request to inspect the documents; and in Count III, he demanded damages for failure to provide the requested documents. On March 5, 2013, Harborview and Zalco filed an answer and a counter-complaint seeking a declaratory judgment that Dr. Clark was not entitled to inspect the detailed billing reports and written advice of counsel.

1

Following a two-day bench trial, the circuit court rendered its decisions on October 16, 2013. The court decided, among other things, to deny Dr. Clark's request to inspect the written advice of Harborview's counsel, but entered a permanent injunction enjoining Harborview and Zalco from denying Dr. Clark's request to inspect and copy legal invoices and billing records concerning Dr. Clark, his family, and the Unit. The Court also enjoined Harborview and Zalco from refusing to provide Dr. Clark any future e-mails between Harborview and Zalco concerning the financial well-being of Harborview, and required that they comply with any future request by Dr. Clark for e-mails concerning the financial well-being of Harborview.

For the reasons that follow, we affirm the judgments of the circuit court regarding the scope and application of the Maryland Condominium Act, and hold that RP § 11-116 does not abrogate the attorney-client privilege or the work product doctrine. We also find no error on the ancillary matter of the court's exclusion of Harborview's proffered expert testimony. We are compelled, however, to vacate the court's order enjoining Harborview and Zalco from refusing to produce future e-mail correspondence, as it is not based on any showing of a likelihood of future irreparable harm.

## BACKGROUND

**Litigation History**

Context bears special significance in this appeal wherein the request for the inspection of financial and attorney-client privileged records is made by an adversary in a series of contentious law suits and administrative actions. In our unreported opinion in an earlier related action between these parties, *Clark v. Zalco Realty, Inc.*, No. 277, Sept. Term

2

2012, slip op. at 2-3 (filed Apr. 24, 2013), we summarized the facts of Dr. Clark's

acquisition of the property and the underlying conflict as follows:

> In 2009, [Dr. Clark] learned that a penthouse unit ("the Unit") of the Harborview Building in downtown Baltimore was to be sold at auction, "as is." Appellant made a few visits to see [the Unit], the last of which was to a cocktail reception on the night before the auction. It was raining heavily, and [Dr. Clark] noticed water dripping from the ceiling into two bowls.

> The next morning, [Dr. Clark] met with Gisele Rivera—the building's property manager and a Zalco employee—to discuss the leak he had seen. According to [Dr. Clark's] deposition testimony, Ms. Rivera told him that the roof was scheduled to be repaired "in the March time frame," and she showed him "books that had construction plans and schedules."

> [Dr. Clark] won the auction for the property, and the Council had its property management contractor, Zalco Realty, prepare a resale certificate as required by [RP] § 11-135(c). The document certified that the Council had no knowledge "that any alteration or improvement to the unit or to the limited common elements assigned to the unit violates any provision of the declaration, by laws, or rules or regulations," *see* [RP] § 11-135(a)(4)(ix), and no knowledge "of any violation of the health or building codes with respect to the unit," *see* [RP] § 11-135(a)(4)(x). The certificate further stated that there were no "capital expenditures approved by [the Council] planned at the time of the conveyance which are not reflected in the current operating budget disclosed" to [Dr. Clark], *see* [RP] § 11-135(a)(4)(iv), (vi).

> In the wake of a large snowstorm in 2010, the water leak in the Unit worsened. A mold expert tested the Unit for spores and recommended that it be vacated. [Dr. Clark] began remediation efforts in the summer, but they proved unsuccessful because water continued to leak in through the building's roof.

On October 20, 2010, Dr. Clark filed suit against Harborview and Zalco alleging

that they had engaged in fraudulent misrepresentation and unfair or deceptive trade

practices, and seeking $5 million in damages. That complaint was resolved on summary

judgment in favor of Harborview and Zalco on February 23, 2012. This Court affirmed

the judgment of the Circuit Court for Baltimore City on April 24, 2013.

3

During the interval between his purchase of the Unit and the October 20, 2010, complaint, Dr. Clark filed a number of administrative complaints related to his Unit. Following a noise complaint from downstairs neighbors and a January 19, 2010, "cease and desist" letter from Harborview advising Dr. Clark to have his child play in the downstairs recreation area or invest in soundproofing, Dr. Clark filed a complaint with the U.S. Department of Housing and Urban Development, alleging familial status housing discrimination against Harborview. That complaint, dated January 28, 2010, was dismissed for lack of probable cause. In February, the complaint was referred to the Maryland Commission on Human Relations, which, after investigation, also made a finding of no probable cause on August 17, 2010.

Dr. Clark filed three complaints with the Baltimore City Health Department during the months of May and June 2010, alleging the presence of mold in his Unit and contamination from pigeon droppings. These complaints were ultimately dismissed following evidentiary hearings. On June 15, 2010, Dr. Clark also filed a complaint against Harborview in the Maryland Office of the Attorney General, Consumer Protection Division. The complaint, alleging that Harborview failed to properly maintain the common elements of the building, was later withdrawn.

On May 8, 2013, Dr. Clark filed another complaint against Harborview in the Circuit Court for Baltimore City, along with a Petition for Order of Arbitration and Stay of Action. In his complaint for specific performance, negligence, breach of contract, and breach of fiduciary duty, Dr. Clark alleged, *inter alia*, that Harborview failed to retain a reasonable repair and replacement reserve fund and breached its duty to remediate damage

4

caused to his Unit from water infiltration and mold contamination. Dr. Clark demanded, and the circuit court ordered, arbitration of that complaint. Harborview appealed, contending that the circuit court erred by not finding that Dr. Clark had waived his right to arbitration because he improperly split his claims (arising from the same facts) by litigating to judgment less than all of his legal theories in a prior action before bringing the subject suit. In an unreported opinion, *Harborview v. Clark*, No. 1314, Sept. Term 2013 (filed April 8, 2015), we affirmed the judgment of the circuit court.[1]

While Dr. Clark's first appeal to this Court was pending, and prior to filing the case underlying the second appeal, the events leading to the instant appeal were developing.

**The Present Case**

The opening act was Dr. Clark's November 20, 2012, request, sent by letter through counsel, to examine and copy Harborview's books and records relating to the financial welfare of the Condominium, including "all of the Condominium's legal bills from October 2009 through the present[.]" The letter advised that Dr. Clark had entered into a common interest agreement with James W. Ancel, Sr., the owner of Penthouse 4C at 100 Harborview Drive. Penthouse 4C, LLC, whose sole member is James W. Ancel, Sr., had filed a complaint (similar to, though entirely separate from this appeal) on April 8, 2011,

---

[1] Following Harborview's appeal to this Court, Dr. Clark filed a line in the circuit court withdrawing the petition for order of arbitration and requesting entry of a new scheduling order. Dr. Clark challenged this Court's decision denying his motion to dismiss Appellant's appeal as moot by filing a writ of certiorari in the Court of Appeals. *Clark v. 100 Harborview Drive Council of Unit Owners*, 438 Md. 143 (2014). After the Court denied the writ, Dr. Clark withdrew his election to waive arbitration on June 13, 2014.

5

requesting the production of books and records pursuant to RP § 11-116. That complaint went to arbitration, and on January 5, 2012, the arbitration panel found, among other things, that RP § 11-116 "provides unit owners with a broad right to inspect the books and records of the Condominium[,]" including "any written advice of legal counsel if the requesting unit owner is the subject of that advice."[2] Dr. Clark's November 20, 2012, letter to Harborview cited the Penthouse 4C, LLC arbitration award as binding precedent, and further instructed that "the Council may not redact the Condominium's legal bills unless one of the limited circumstances set forth in § 11-116(c)(3) of the Maryland Condominium Act apply."

On December 5, 2012, Harborview responded, instructing Dr. Clark to contact Zalco to schedule a time to inspect the requested documents. After scheduling a date to inspect the documents, Dr. Clark sent another letter to Harborview expanding his records inspection request to include "any written advice of legal counsel that relates to or concerns [Dr. Clark], Rebecca Delorme [Dr. Clark's spouse], or Penthouse 4A." Harborview responded by letter dated December 18, 2012, stating that legal invoices would be made available for inspection, but that detailed billing reports from legal counsel would not be made available because they were considered privileged and, therefore, were not maintained as regular financial books or records of Harborview. Further, Harborview asserted that in any case, legal documents that constituted a financial book or record would

---

[2] Penthouse 4C, LLC, filed a petition to confirm the arbitration award and enter judgment on January 10, 2012. On October 17, 2012, the circuit court entered an order confirming the arbitration award. The order was not appealed.

6

only be produced as they pertained to the requesting unit owner, so the requests for records pertaining to Rebecca Delorme and Penthouse 4A would not be produced.

On December 19, 2012, Rebecca Delorme—acting as Dr. Clark's agent—inspected and copied documents at Zalco's office in Silver Spring, Maryland. She was refused access to the detailed billing reports or written advice of counsel. Ms. Delorme did, however, review four boxes of documents, and she received copies of all available legal invoices from 2009 to 2012. Two days later, Dr. Clark notified Harborview by letter that Ms. Delorme had not been given access to all the books and records requested, and renewed his requests for detailed billing reports (including any other supporting documentation for legal invoices) and for "legal opinions or the written advice of legal counsel."

Dr. Clark filed the underlying suit on January 16, 2013, seeking preliminary and permanent injunctions, specific performance, and damages for breach of contract in the amount of $30,000.00. He argued that the By-laws constituted a contract between him and Harborview, as well as between him and Zalco as Harborview's managing agent. He alleged that Harborview and Zalco breached their contractual obligations by refusing to permit him to inspect the documents at issue, and that unless his request for preliminary injunction was granted, he faced the "fact" that Harborview would move to compel his claims to arbitration under Article XV of the By-laws, thereby requiring him to "go through the same time-consuming and costly arbitration process that a separate unit owner [Penthouse 4C] recently did."[3] Dr. Clark also alleged that due to the extensive problems

---

[3] Dr. Clark also presented a copy of the Final Arbitration Award in the matter between Harborview and Penthouse 4C, LLC to the circuit court at the October 8, 2013

that he encountered in owning the Unit, including that it was uninhabitable because of mold contamination, he needed the requested documents "immediately to see the impact on how his important investment is being treated."

Harborview and Zalco filed a joint answer on March 5, 2013, admitting that they "refused to make the requested documents available to [Dr. Clark] because they constitute privileged attorney-client communications and privileged attorney work product in several adversarial matters including an ongoing lawsuit brought by [Dr. Clark] against the Council and Zalco." As an affirmative defense, they claimed that Zalco was no longer in contractual privity with Harborview and, therefore, Zalco could not comply with any injunctive order regarding future books or records. That same day, Harborview and Zalco filed a verified counterclaim seeking a declaratory judgment as to whether RP § 11-116 required them to provide Dr. Clark access to written legal advice and detailed billing reports that Harborview received from its attorneys in connection with the representation of Harborview and Zalco in various investigative matters, claims, and litigation brought by Dr. Clark.

The circuit court held a bench trial on October 8 and 9, 2013. The circuit court summarily granted Dr. Clark's pre-trial motion to exclude Harborview's expert witness

---

trial. The Final Arbitration Award was admitted in to evidence, over objection, and on the understanding that it was a non-binding *nisi prius* decision. Therein, the arbitrators concluded that the plain language of RP § 11-116 was sufficient to require Harborview to allow Penthouse 4C, through its agent, to inspect the books and records maintained by Harborview including the written advice of legal counsel. The circuit court memorandum opinion, however, does not specifically address the resolution reached in the arbitration award.

8

who was expected to testify, based on his review of the relevant documents and his familiarity with RP § 11-116, that the books and records that Harborview is required to maintain and provide for inspection do not include the detailed billing reports of legal counsel. At trial, the parties presented lay witnesses' testimony on the issue of the disclosure of detailed billing reports and written advice of counsel. Dr. Clark, for example, testified on cross-examination:

> [Dr. Clark]: I believe that in order for me to assess how my money is being spent and the use of attorneys or I think most would agree, the overuse of attorneys, I have the right to review what they are having you guys do.
>
> [Defense Counsel]: When you say over use of attorneys, what do you mean Sir?
>
> [Dr. Clark]: I mean there's been nearly $2 Million the last few years spent on legal bills. That's insane.
>
> &ast; &ast; &ast;
>
> [Defense Counsel]: And do you expect when you sue Harborview that Harborview will retain Counsel?
>
> [Dr. Clark]: No, I would expect not to have to sue them in fact.
>
> &ast; &ast; &ast;
>
> [Defense Counsel]: Did you know that Harborview retained Counsel to defend the lawsuits that you brought against them?
>
> [Dr. Clark]: I did.
>
> [Defense Counsel]: And did you expect that the law firm that was defending Harborview would be paid for its services?
>
> &ast; &ast; &ast;
>
> [Dr. Clark]: I would expect that they would be paid, but I want to know what they are being paid to do.

9

Dr. Clark continued, characterizing his need to inspect the detailed billings reports provided to Harborview from legal counsel as a need to ensure the "responsible use of funds," and denying that the attorney-client privilege was applicable to those billing reports. However, as the circuit court noted later in its opinion, Dr. Clark admitted that the attorney-client privilege is applicable to the written advice of legal counsel.

Harborview and Zalco offered testimony from Council President John Cochran and Zalco property managers Richard Brandis and Peter Fabreziani, Jr. Mr. Cochran testified that since April of 2009, the Harborview management files have been kept in locked cabinets: "I mean we have bars and padlocks on all the file cabinets and we have our Detailed Billing Reports that are kept in a fire proof safe in the manager's office that only the On-site Manager has the key to." Mr. Cochran testified to the precautions he implemented to avoid inadvertent disclosures of the billing records, stating that "I understood them to be confidential." Former Zalco employee and Harborview property manager, Mr. Fabreziani, also testified to his understanding that detailed billing reports submitted to Harborview were confidential in nature.

At the conclusion of trial, the court granted the defendants' motion for judgment on Count III for breach of contract, finding that there was no evidence presented to support Dr. Clark's damages claim. Later, on October 16, 2013, the circuit court issued its Order and Memorandum Opinion on the remaining judgments. Following a thorough examination of the history and purpose of § 11-116 of the Maryland Condominium Act, and after corresponding analysis of the attorney-client privilege and work product doctrines as applied in Maryland, the circuit court decided:

10

Section 11-116 allows [Dr. Clark] to inspect and copy the e-mails requested by him concerning the financial well being of Harborview. The language of Section 11-116 indicates that "books and records" under that section relate to financial information, as it makes reference to "accounting practices" and "audits." Md. Code Ann., Real Prop., § 11-116(a)-(b). [Harborview and Zalco] do not dispute this interpretation. Indeed, [President of the Harborview Council of Unit Owners, John] Cochran produced these e-mails to [Dr. Clark]. Cochran uncontrovertedly described his process of sifting through thousands of e-mails and supplying all of those fitting the description of [Dr. Clark's] request.

[Dr. Clark] is additionally entitled to inspect and copy the detailed billing reports or supporting documentation for Harborview's legal invoices concerning him, his family, and his unit. Although [Harborview and Zalco] have asserted the attorney-client privilege and work product doctrine with respect to this information, they have not demonstrated the applicability of either of these. [Harborview and Zalco's] blanket assertion is insufficient to overcome the presumption that information contained in detailed billing reports is generally unprotected.

\* \* \*

This Court recognizes that, pursuant to Section 11-116(c)(3), [Dr. Clark] is unambiguously granted the right to inspect the written advice of Harborview's legal counsel if he, his family, and his unit are the subject of that information. . . . Notwithstanding that statutory language, [Dr. Clark] may only obtain such information if the statute clearly abrogated the common law privilege and doctrine. . . . The language of Section 11-116 displays no express abrogation of the above-described common law privilege and doctrine.

(Internal citations omitted). The court also decided that RP § 11-116 does not impliedly abrogate the common law attorney-client privilege and work product doctrine because it found that the existence of the privilege and the doctrine did not have the effect of "depriving the statute's efficacy and rendering its provisions nugatory." The circuit court explained:

[S]ection 11-116 is read as being in harmony with the common law privilege and doctrine: it allows a unit owner who is the subject of the written advice

11

of the condominium's legal counsel to inspect that information, provided that it is not protected by the common law attorney-client privilege or the work product doctrine.

(Internal citations omitted).

The court granted Dr. Clark's prayer for injunctive relief and specific performance with respect to detailed billing reports and supporting documentation for legal invoices; however, Dr. Clark's request for the written advice of legal counsel was denied. In granting the request for a declaratory judgment, the court proclaimed that RP § 11-116 "does not invalidate the common law attorney-client privilege and work product doctrine, which safeguard [written advice of legal counsel] from public view."[4] The court declared, therefore, that RP § 11-116 does not require Harborview to make the written advice of legal counsel regarding Dr. Clark, his family, or his unit available for inspection and copying by Dr. Clark, the unit owner.

---

[4] The Court of Appeals in *Harford Mutual v. Woodfin Equities Corp.*, 344 Md. 399, 414 (1997), explained that "when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.'" (quoting *Christ by Christ v. Maryland Dep't of Natural Res.*, 335 Md. 427, 435 (1994)). "[W]hether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made." *Case v. Comptroller*, 219 Md. 282, 288 (1959). Although the order of the circuit court in this case does not fully comply with the requirements by providing an entirely separate written declaratory judgment, we recognize the circuit court's order as sufficiently clear to declare the rights and obligations of the parties. We further note that even were this not so, the circuit court's failure to enter a proper declaratory judgment is a procedural error, rather than a jurisdictional error. *Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 651 (2001). "This Court, in its discretion, may 'review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court.'" *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256 (2009) (quoting *Bushey*, 362 Md. at 651).

Finally, the court noted that as of the date of the trial, it was uncontradicted that Harborview and Zalco had produced all prior e-mail correspondence regarding the financial well-being of the condominium. Accordingly, the circuit court denied injunctive relief for existing communications. However, the court enjoined Harborview and Zalco from refusing to produce any future e-mails between them concerning the financial well-being of the condominium.

Harborview and Zalco filed a timely motion to alter or amend and request for hearing as well as a motion to stay the enforcement of the circuit court's orders. The court denied both motions without a hearing on December 10, 2013. On December 17, 2013, Harborview and Zalco filed a notice of appeal from the circuit court's orders of September 20 (excluding expert witness), October 16 (final judgment), and December 10, 2013 (denying reconsideration).

Appellants present the following issues, which we have slightly rephrased, for review:

I.   Did the circuit court err by excluding the testimony of Harborview's expert, Gehrig Cosgray, CPA?

II.  Did the circuit court err by concluding that the detailed billing reports of Harborview's counsel are "books and records" subject to inspection by Clark under section 11-116 of the Condominium Act?

III. Did the circuit court err in not accepting Harborview's claims of attorney-client privilege and work product in the detailed billing reports?

IV.  Did the circuit court err by entering injunctive relief against Zalco because Zalco's management contract ended on December 31, 2012, and Zalco returned all of Harborview's records and materials?

13

V.	Did the circuit court err by enjoining Harborview to comply with future requests for e-mails between Harborview and Zalco concerning Harborview's financial well-being?

On December 26, 2013, Dr. Clark noted his cross-appeal from the Order of October 16, 2013, and presents the following question for review:

Was the circuit court legally correct in holding that § 11-116(c)(3)(v) of the [Maryland Condominium Act] does not require Harborview to make written advice of legal counsel for Harborview concerning Dr. Clark, his family, and his Unit available for inspection by Dr. Clark when he is the subject of the written legal advice?

We include additional facts in the discussion relevant to the issues there examined.

**DISCUSSION**

Dr. Clark argues that both Article X of the Harborview By-laws and RP § 11-116 allow a unit owner to inspect and copy the detailed billing reports and the written legal advice of counsel without regard for whether any of the material is privileged.[5] However,

---

[5] Article X of the By-laws of 100 Harborview Drive Condominium provides, in pertinent part:

The Board shall keep the books of the Council, with detailed accounts in chronological order, noting all receipts and expenditures affecting the property and its administration, and specifying the maintenance and repair expenses of the common elements and any other expenses incurred. A separate account shall be maintained for each condominium unit, showing the amount of each assessment of common expenses . . . . The books together with all bills, statements and vouchers accrediting the entries made thereupon, all other records kept by the board . . . shall be available for examination and copying by any unit owner and any holder, insurer, or guarantor of a mortgage on any unit, and the duly authorized agents or attorneys of such unit owner, holder, insurer, or guarantor, during normal business hours, and after reasonable notice. All books and records of the Council shall be kept in accordance with good accounting practices, on a consistent basis, and an outside audit shall be made at least once a year with

14

as the circuit court recognized in constraining its analysis primarily to the application of RP § 11-116, the statutory provision is more specific in defining the material to be produced. Indeed, the "Rules of Construction" contained in RP § 11-124 direct as follows:

> *Conflicts in provisions* (e) If there is any conflict among the provisions of this title, the declaration, condominium plat, bylaws, or rules adopted pursuant to § 11-111 of this title, the provisions of each shall control in the succession listed hereinbefore commencing with "title".

Likewise, the Court of Appeals has instructed that in regard to the MCA, "[i]f there is any conflict between the provisions of the various documents governing the condominium, the statute controls, then the declaration, plat, bylaws, and rules in that order." *Ridgely Condo. Ass'n, Inc. v. Smyrnioudis*, 343 Md. 357, 361 (1996) (citing RP § 11-124(e)). Accordingly, we look to RP § 11-116 (and not the By-laws) to determine what documents are available for inspection and copying by Harborview unit owners.

## I.

## Privileged Communications Under
## § 11-116 of the Maryland Condominium Act.

Harborview and Zalco maintain that the longstanding common law and statutory principles of attorney-client privilege, the work product doctrine, and the basic tenets of the adversarial system must control over RP § 11-116 where the unit owner and council of unit owners are directly adverse to one another. They assert that Dr. Clark seeks an unfair

---

respect to common expenses. The cost of such audit or audits shall be considered part of the common expense.

advantage in ongoing litigation by obtaining, via the Condominium Act, what would otherwise be prohibited to him in discovery. Harborview and Zalco also contend that reading RP § 11-116 to allow the discovery of privileged litigation materials would have the effect of abrogating longstanding common law in Maryland.

This Court analyzes a circuit court's interpretation of statutory provisions *de novo*. *Powell v. Breslin*, 195 Md. App. 340, 346 (2010) (citing *Maryland–National Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 181 (2006)), *aff'd,* 421 Md. 266 (2011); *see also Moore v. State*, 388 Md. 446, 452 (2005). "Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not." *Goss v. C.A.N. Wildlife Trust, Inc.*, 157 Md. App. 447, 456 (2004). "[W]here the order involves an interpretation and application of Maryland statutory and case law, [we] must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter,* 367 Md. 386, 392 (2002) (citing *In re Mark M.*, 365 Md. 687, 704-05 (2001)).

### a. The phrase "books and records" includes written advice of counsel and detailed billing reports.

The MCA establishes the statutory framework for a condominium regime, including the scope and duties of condominium development and ownership in Maryland. *Ridgely Condo. Ass'n, Inc.*, 343 Md. at 360. Our focus in this appeal is on RP § 11-116 of the MCA, which provides, in pertinent part:

**§ 11-116.  Books and records to be kept; audit; inspection of records.**

(a) *Books and records to be kept.* — The council of unit owners shall keep books and records in accordance with good accounting practices on a consistent basis.

\* \* \*

(c) *Inspection of records.* — (1)(i) Except as provided in paragraph (3) of this subsection, all books and records, including insurance policies, kept by the council of unit owners shall be maintained in Maryland or within 50 miles of its borders and shall be available at some place designated by the council of unit owners for examination or copying, or both, by any unit owner, a unit owner's mortgagee, or their respective duly authorized agents or attorneys, during normal business hours, and after reasonable notice.

(ii) If a unit owner requests in writing a copy of financial statements of the condominium or the minutes of a meeting of the board of directors or other governing body of the condominium to be delivered, the board of directors or other governing body of the condominium shall compile and send the requested information by mail, electronic transmission, or personal delivery:

\* \* \*

(3) **Books and records kept by or on behalf of a council of unit owners may be withheld from public inspection, except for inspection by the person who is the subject of the record or the person's designee or guardian, to the extent that they concern:**

(i) Personnel records, not including information on individual salaries, wages, bonuses, and other compensation paid to employees;

(ii) An individual's medical records;

(iii) An individual's personal financial records, including assets, income, liabilities, net worth, bank balances, financial history or activities, and creditworthiness;

(iv) Records relating to business transactions that are currently in negotiation;

**(v) The written advice of legal counsel**; or

(vi) Minutes of a closed meeting of the board of directors or other governing body of the council of unit owners, unless a majority of a quorum of the board of directors or governing body that held the meeting approves unsealing the minutes or a recording of the minutes for public inspection.

(Emphasis added).

Harborview and Zalco argue that the meaning of the phrase "books and records" contained in the statute does not include written advice of counsel or detailed billing reports. Dr. Clark contends—and the circuit court found—that in the context of the statute, the phrase "books and records" does include the detailed billing reports provided to Harborview and Zalco by their legal counsel, and that through the exception to the allowed withholdings, emphasized above, Dr. Clark is statutorily entitled to those documents. Dr. Clark also argues that the circuit court erred by not finding that RP § 11-116 abrogated the common law attorney-client privilege and work product doctrine. He maintains that he is entitled, through the MCA, to inspect the written advice of opposing counsel.

The goal of any statutory interpretation analysis is to give effect to the legislative purpose or policy underlying the statute. *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006) ("*Mayor of Oakland*"); *State Dep't of Assessments & Taxation v. Maryland-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13-14 (1997). Where, as here, the applicable phrase "books and records" is not defined, this Court first looks to the plain and ordinary meaning of the words in determining that purpose or policy. *Schreyer v. Chaplain*, 416 Md. 94, 108 (2010) (citing *Pelican Nat'l Bank v. Provident Bank*, 381 Md. 327, 336 (2004); *Comptroller of the Treasury v. Kolzig*, 375 Md. 562, 567 (2003)). We will refrain from "resort[ing] to subtle or forced interpretations for the purpose of extending or limiting the operations of the statute." *Maryland-Nat'l Capital Park & Planning Comm'n*, 348 Md. at 14-15 (citing *Brown v. State*, 285 Md. 469, 474 (1979)). The phrase must be reviewed in context and interpreted in conformity with the meaning of its companion terms. *See Lockshin v.*

18

*Semsker*, 412 Md. 257, 275 (2010) (citations omitted) ("We . . . do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone."). If, after a plain meaning analysis, the purpose of the statute remains ambiguous, we will look for other clues—e.g., longstanding interpretation, the overall legislative scheme, the legislative history, and the general purpose and intent of the statute. *Breslin v. Powell*, 421 Md. 266, 286-88 (2011).

On its face, RP § 11-116 clearly establishes that the phrase "books and records" necessarily includes documents maintained "in accordance with good accounting practices . . . including insurance policies"; "financial statements of the condominium"; and "the minutes of a meeting of the board of directors or other governing body." The exceptions enumerated in RP § 11-116(c)(3) permit the reasonable inference that "books and records" maintained by the Council of Unit Owners also includes, among other things, personnel records, records relating to current business transactions, and the written advice of counsel. The latter documents however, are protected by the exception to disclosure, which provides that they may be withheld from inspection by all except "the person who is the subject of the record or the person's designee or guardian[.]" RP § 11-116(c)(3).

In its Memorandum Opinion, the circuit court recognized that, "pursuant to Section 11-116(c), [Dr. Clark] is unambiguously granted the right to inspect the written advice of Harborview's legal counsel if he, his family, and his Unit are the subject of that information." We agree that the plain language of RP § 11-116 allows Dr. Clark to request access to the written advice of counsel, as well as the billing records of counsel, so long as he and/or his unit are "the subject of the record." However, it is also clear that these records

19

would normally be subject to the attorney-client privilege and work product doctrine, especially where, as here, Dr. Clark and Harborview are adverse parties in ongoing litigation. We arrive then, at the juncture where we must examine whether the exception to the exception to disclosure contained in RP § 11-116(c)(3) abrogates the attorney-client privilege and work product doctrine.

### b. The MCA Does Not Abrogate the Attorney-Client Privilege or the Work Product Doctrine.

#### i. Modalities of Abrogation

Harborview and Zalco contend, and the circuit court found, that RP § 11-116(c)(3) "does not abrogate" the common law attorney-client privilege. As a point of clarification, we understand that the parties do not employ the term "abrogate" as it is traditionally used.[6] To be sure, none of the parties contend that RP § 11-116 repeals or extinguishes the entire attorney-client privilege as a part of the general common law in Maryland. Rather, Dr. Clark posits that RP § 11-116 creates an exception to the application of the attorney-client privilege by mandating disclosure of Harborview's confidential legal records to him, as a unit owner and subject of the records, without further qualification. Nevertheless, as we shall see, although Maryland courts most frequently use "abrogate" to denote the full

---

[6] Black's Law Dictionary defines abrogation as "[t]he abolition or repeal of a law, custom, institution, or the like." Black's Law Dictionary 8 (10th ed. 2014). Consistent with this definition, the courts of Maryland have used the term "abrogate" when referring to an enactment or judicial decision that repeals or replaces another law or principle in its entirety. *See, e.g., Robinson v. State*, 353 Md. 683, 694 (1999) (abrogating the common law crimes of assault and battery by codifying the entire subject-matter); *Loh v. Safeway Stores, Inc.*, 47 Md. App. 110, 126-27 (1980) (abrogating the common law principle that where a plaintiff has accepted satisfaction in full from one tort-feasor the right to proceed against other joint tort-feasors is extinguished).

20

removal or replacement of a law or principle, the term is sometimes employed where a limited exception to the common law is created. *See e.g., Fagerhus v. Host Marriot Corp.*, 143 Md. App. 525, 535 (2002).

In *Boblitz v. Boblitz*, the Court of Appeals recognized that where the legislature intends, "[the common law] may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides[.]" 296 Md. 242, 274 (1983) (quoting *Pope v. State,* 284 Md. 309, 341-42 (1979)), *holding modified by Bozman v. Bozman*, 376 Md. 461, 470 (2003) (judicially abrogating the interspousal immunity doctrine as "a vestige of the past [and] no longer suitable to our people" and stating that where no legislative barrier to abrogation exists, the Court of Appeals also has the power and authority to abrogate a common law rule). In the seminal case on abrogation, *Lutz v. State*, 167 Md. 12, 15 (1934), the Court of Appeals examined the precedent contained in the Ruling Case Law:[7]

> In 25 R. C. L. 1054, it is said that: "It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. **In order to hold that a statute has abrogated common law rights existing at the date of its**

---

[7] Ruling Case Law (cited as R.C.L.) was an American Legal Encyclopedia published from 1865 to 1929 by McKinney, William Mark, 1865-1955, ed.; Rich, Burdett Alberto, 1854-1925, [from old catalog] joint ed.; Porterfield, Charles, [from old catalog] joint ed.; Farnham, Henry P. (Henry Philip), 1863-1929, joint ed.; Fisher, S. B., [from old catalog] joint ed. It was the predecessor to American Jurisprudence. The full original title is "Ruling case law as developed and established by the decisions and annotations contained in Lawyers reports annotated, American decisions, American reports, American state reports, American and English annotated cases, American annotated cases, English ruling cases, British ruling cases, United States Supreme court reports, and other series of selected cases."

**enactment, it must clearly appear that they are repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory**."

Where, however, a statute and the common law are in conflict, the common law yields to the statute to the extent of the inconsistency, Sutherland on Stat. Const. § 294; 12 C. J. 186, and a statute which deals with an entire subject–matter is generally construed as abrogating the common law as to that subject.

(Emphasis supplied). More recently, the Court of Appeals has reiterated this principle by stating, "[i]t is a generally accepted rule of law that statutes are not presumed to repeal the common law further than is expressly declared." *Robinson,* 353 Md. at 693 (citation omitted) (internal quotation marks omitted). Additionally, where a statute deals with an entire subject-matter, that statute is often construed as impliedly abrogating the common law as to that subject. *Id.* (citing *Lutz*, 167 Md. at 15; *Watkins v. State,* 42 Md. App. 349, 353-54 (1979)).

Of these two common modalities by which a statute may be held to abrogate the common law—express abrogation and abrogation by adoption of a statutory scheme that deals with an entire subject matter, *see Lutz*, 167 Md. at 15—the latter is easily identifiable and has figured prominently in Maryland case law. In *Robinson v. State*, the Court of Appeals held that the 1996 enactment establishing the statutory crime of assault replaced the common law crimes of assault and battery. 353 Md. at 694. The Court stated:

To be sure, the language of the 1996 assault statutes contain no specific words of repeal or abrogation, nor is there any conflict between those statutes and the common law. We have determined, however, that the statutes as adopted represent the entire subject matter of the law of assault and battery in Maryland, and as such, abrogate the common law on the subject.

22

*Id.*; *see also Watkins*, 42 Md. App. at 354 ("The [escape] statute as adopted represented the entire subject matter of the law of escape in Maryland and thereby abrogated the common law of escape.").

In contrast, whether a statute constitutes an express abrogation of the common law engenders a murkier analysis. Typically, "abrogation" is declared in the circumstance where the law, right, or duty previously held is completely extinguished. *See Loh*, 47 Md. App. at 114, 118. And, despite the language in *Lutz*, it is not always necessary that the statute contain words expressing the intention to abrogate the law, right or duty previously held. *See, e.g.*, *id.* at 126-27 (concluding that the Uniform Contribution Among Tortfeasors Act, which did not include express language of abrogation, but provided that "[a] release by the injured person of one joint tort-feasor . . . does not discharge the other tortfeasors unless the release so provides," Maryland Code (1957, 1979 Repl. Vol.) Article 50 § 19, operated to abrogate the common law rule that the release of one joint tort-feasor releases all tort-feasors). This is consistent with the principle articulated in *Lutz*—where the common law rule and the statute are in such direct conflict that they cannot co-exist. 167 Md. at 15.

In *Moaney v. State*, 28 Md. App. 408, 413 (1975), this Court observed that although under the common law "it appears that a person accused of grand larceny is entitled to be tried upon an indictment returned by a grand jury," that principle was abrogated through both legislative enactment and rule change. *Id.* at 414-15. The statute in question, as enacted in 1973, and the contemporaneous amendments to the Maryland Rules, provided that a person charged with a felony, other than a felony within the jurisdiction of the district

23

court, and who has not requested a preliminary hearing within ten days after being informed of such hearing, or for whom a preliminary hearing has been held, may be charged by information at the election of the State's Attorney. *Id.* We observed that "[w]hether to seek indictment or charge by information is now at the election of the State's Attorney within the conditions specified," and that "the common law right has also been changed by amendment to the Maryland Rules." *Id.* at 414-15. Although the right to be charged through grand jury indictment was not categorically dissolved, we found that the common law rule regarding persons charged with a felony under limited circumstances was rendered completely without effect. *See id.*

In *Fagerhus v. Host Marriott Corp.*, we addressed a case involving a limited departure from the common law rather than a full abrogation. 143 Md. App. 525, 535-36*, cert. denied*, 369 Md. 572 (2002). When presented with the question of whether Maryland's recreational use statute ("MRUS") "abrogate[d] traditional premises liability law under which a property owner must take reasonable care to make his premises safe or to warn of dangerous conditions," we more narrowly determined that "the language of th[e] subtitle and its legislative history make it clear that the legislature intended to carve out an exception." *Id.* Regarding the relevant portion of the recreational use statute, we stated:

Section 5-1103 of the MRUS plainly states:

> Except as specifically ... provided in § 5–1106 ..., an owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition ... on the premises to any person who enters on the land for these purposes.

* * *

24

We need not speculate whether the legislature intended the MRUS to limit traditional premises liability standards, because it codified an intent to do so.

> The purpose of this subtitle is to encourage any owner of land to make land, water, and airspace above the land and water areas available to the public for any recreational and educational purpose *by limiting the owner's liability* toward any person who enters on land, water, and airspace above the land and water areas for these purposes. NR § 5–1102(a).

*Id.* at 536-37 (emphasis in original) (footnote omitted). In the context of a direct textual conflict with the common law rule (owner must take reasonable care versus owner owes no duty of care) and a "purpose provision" in the statute articulating the legislature's intent to limit liability, the *Fagerhus* Court noted that the statute "explicitly abrogates common law principles of premises liability." *Id.* at 542. In the matter *sub judice*, however, we lack such explicit guidance from the General Assembly.

Here, it is clear that RP § 11-116 contains no specific words of repeal or abrogation. Moreover, on its face, the statute does not directly conflict with the common law attorney-client privilege such that the two cannot co-exist. The statute neither invalidates nor supplants the entire subject matter of attorney-client privilege or work product doctrine. Under similar circumstances, the Court of Appeals examined the history of both the statute and the common law to determine whether the common law right is "repugnant to the act, or the part thereof invoked, that [its] survival would in effect deprive it of its efficacy and render its provisions nugatory." *Nickens v. Mount Vernon Realty Grp., LLC*, 429 Md. 53, 75 (2012) (citations and internal quotation marks omitted).

In *Nickens*, the Court of Appeals addressed whether a mandatory eviction notice ordinance in Baltimore City abrogated or superseded a property owner's long-recognized

25

right to peaceable self-help. 429 Md. at 73 (2012). Absent express language abrogating or superseding the common law, the Court looked to the legislative history of the ordinance and conducted an extensive review of the origin and rationale underlying the common law principle. The Court stated:

> Our goal is, as much as possible, to harmonize [the ordinance] with the common law remedy of peaceable self-help (as derived from its antecedent English statutes), for "various consistent and related enactments, although made at different times and without reference to one another, nevertheless should be harmonized as much as possible."

*Id.* at 74 (quoting *Pete v. State*, 384 Md. 47, 65-66 (2004)).

Returning to our review of RP § 11-116, absent a clear repeal or abrogation, we will focus on the legislative history and the cardinal rule of statutory construction—to give effect to the intent of the legislature. *Mayor of Oakland*, *supra,* 392 Md. at 316. More specifically, we must ascertain whether the language of the statute can be harmonized with the common law, or whether the intent of the legislature was to grant such broad access to records that it rendered the statute "clearly contrary to the common law right [so] that the two cannot occupy the same space." *Nickens*, 429 Md. at 74.

### ii. Legislative History of RP § 11-116(c)(3)

The Horizontal Property Act—precursor to the Maryland Condominium Act—was enacted in 1963 and contained a requirement that accounting books and records of expenditures be maintained and available to condominium owners for examination. 1963 Md. Laws, ch. 387 (H.B. 1). Section 130 of the Horizontal Property Act provided:

> The manager or board of directors, or other form of administration provided in the by-laws, shall keep books with detailed accounts in chronological order, of the receipts and of the expenditures affecting the building and its

26

administration and specifying the maintenance and repair expenses of the common elements and any other expenses incurred. The books and vouchers accrediting the entries made thereupon shall be available for examination by the co-owners, their duly authorized agents or attorneys, at normal business hours. All books and records shall be kept in accordance with good accounting practices and an outside audit be made at least once a year.

(Codified as Md. Ann. Code (1957, 1966 Repl. Vol.), Art. 21 § 130). The 1963 enactment clearly contemplated "books with detailed accounts . . . of the receipts and of the expenditures . . . kept in accordance with good accounting practices." It made no provision for the maintenance or availability of documents beyond those directly concerning the finances of the condominium.

In 1974, pursuant to the Laws of Maryland, chapter 12, the Maryland Horizontal Property Act was recodified as part of the Annotated Code of Maryland at §§ 11–101 *et seq.* of the Real Property Article. Later that year, the Horizontal Property Act was renamed as the Maryland Condominium Act. 1974 Md. Laws, ch. 641 (S.B. 714). The original audit and inspection provision in the MCA was recodified as RP § 11-113 and provided:

> (A)   The manager, board of directors, or other person in charge of administration provided in the by-laws shall keep books and records in accordance with good accounting practices on a consistent basis.
> (B)   On the request of the unit owners of at least 5 percent of the units, an audit by an independent certified public accountant shall be made not more than once in any consecutive 12 month period. The cost of the audit shall be a common expense.
> (C)   **Every record kept by the council of unit owners shall be available for examination and copying by any unit owner**, his duly authorized agents or attorneys, at his expense, during normal business hours, and after reasonable notice.

1974 Md. Laws, ch. 641 (S.B. 714) (emphasis added). The 1974 MCA provision maintained a focus on "books and records in accordance with good accounting practices."

27

However, the addition of a mandate that "[e]very record kept by the council . . . shall be available for examination[,]" left open the argument that "books and records" under the MCA could be construed more broadly than under the Horizontal Property Act.

In 2004, the General Assembly partially addressed this problem by passing House Bill 879, which "alter[ed] the kinds of books and records a homeowners association may withhold from public inspection." 2004 Md. Laws, ch. 382 (H.B. 879). The bill simultaneously altered the books and records inspection provisions for Cooperative Housing Corporations and Homeowner's Associations, as well as Condominiums. *Id.* The Maryland Attorney General submitted written testimony to the House Environmental Matters Committee in support of HB 879, describing the purpose of the legislation:

> Access to the books and records of the governing body of the association is of vital importance to unit and home owners who wish to participate in the democratic process of their associations regardless of the type of common-ownership community they live in. However, some of the records maintained by the governing bodies contain sensitive information, such as private information about individual home or unit owners, employees, or legal proceedings or advice.
>
> * * *
>
> Section 11-109.1 of the Maryland Condominium Act provides that meetings of a Board of Directors may be closed for discussion of [] most of [the] same topics as those listed in the Homeowners Association Act. However, Section 11-116 of the Act provides that "every record" of the condominium be kept available for inspection by unit owners and provides no exception for any topic.
>
> * * *
>
> HB 879 provides a uniform standard for unit and homeowner access to association records . . . and limits the records that may be withheld from unit and homeowners to those topics that the General Assembly has already deemed to be sensitive in nature.

28

*Cooperative Housing Corporations, Condominiums, and Homeowners Associations - Books and Records:  Hearing on H.B. 879 Before the H. Envtl. Matters Comm.*, 2004 Leg., 418th Sess. (Md. 2004) (statement of the Office of the Attorney General, Consumer Protection Division).

Effective October 1, 2004, the new exceptions to disclosure provided:

> [(c)](2) Books and records kept by or on behalf of a council of unit owners may be withheld from public inspection to the extent that they concern:
>> (i) Personnel records;
>> (ii) An individual's medical records;
>> (iii) An individual's financial records;
>> (iv) Records relating to business transactions that are currently in negotiation;
>> (v) The written advice of legal counsel; or
>> (vi) Minutes of a closed meeting of the board of directors or other governing body of the council of unit owners.

2004 Maryland Laws Ch. 382 (H.B. 879) (codified as RP § 11-116).[8] House Bill 879 created, without caveat, six categories of documents that were not subject to mandatory inspection at the request of a unit owner.  Among those was the written advice of legal counsel.  *Id.*

Prompted, in part, by the 2006 final report of the Governor's Task Force on Common Ownership Communities,[9] the General Assembly enacted the 2009 Home

---

[8] Identical language was also added to Maryland Code (1975, 1999 Repl. Vol., 2004 Supp.), Corporations and Associations § 5-6B-18.3 (cooperative housing corporations), and RP § 11B-112 (homeowner's associations).

[9] The Governor's Task Force on Common Ownership Communities was established by 2005 Laws of Maryland, chapter 469 (S.B. 229).  The Task Force expressed particular interest in bringing uniformity to the disclosures made to prospective condominium unit buyers under what it considered to be apparent inconsistencies under sections 11-126 and

Financial Accountability Act ("HFA"). 2009 Md. Laws, ch. 659 (H.B. 137). The HFA also made identical amendments to several provisions of the Maryland Cooperative Housing Corporation Act and the Maryland Homeowners Association Act in addition to the MCA. All of the revisions authorized the withholding of certain documents from an association member or unit owner.[10] *Id.* The specific revisions to RP § 11-116 (and the other Acts) prohibited a Council of Unit Owners from withholding any books or records from inspection by the person who is the subject of the record. *See* RP § 11-116(c)(3) (reproduced *supra*). Thus, the protections for sensitive information implemented by the 2004 amendment were left intact with the exception that otherwise withholdable

---

11-135 of the condominium act. The Task Force noted that "disclosures var[ied] depending on whether the transaction is the initial sale of a unit (RP 11-126), or if the transaction is a resale of a unit in a condominium that has 7 or more units (RP 11-135(a)) or fewer than 7 units (RP 11-135(b))." Governor's Task Force on Common Ownership Communities, Final Report, at 31 (Dec. 31, 2006).

[10] The provisions of the Cooperative Housing Corporation Act and the Maryland Homeowners Association Act—codified at Md. Code (1975, 2014 Repl. Vol.), Corporations and Associations Article ("CA") § 5-6B-26 and Md. Code (1974, 2010 Repl. Vol.), Real Property Article § 11B-112, respectively—were amended to add language identical to that added to § 11-116. Both sections provide:

> (2) Books and records kept by or on behalf of a [cooperative housing corporation or homeowners association] may be withheld from public inspection, except for inspection by the person who is the subject of the record or the person's designee or guardian, to the extent that they concern:
>
> * * *
> (v) The written advice of legal counsel; or

CA § 5-6B-26, RP § 11B-112. Neither of these provisions has been discussed or construed by the appellate courts of Maryland.

documents should be made available to a unit owner whose person or property is the subject of the document(s).

Tracing the history of the "books and records" inspection provisions applicable to Maryland condominiums and common ownership communities, we cannot conclude that the intent of the legislature was to grant such broad access to documents that the MCA abrogates fundamental common law principles and protections, such as the attorney-client privilege and work product doctrine. Nor does RP § 11-116 so clearly dominate the subject-matter to warrant implied abrogation of the common law. Rather, the General Assembly has evinced the intention to provide the information necessary to property owners so that they might assess and protect their investments, while simultaneously recognizing the importance of protecting certain documents from unnecessary disclosure. Clearly, the exception to the exception was intended to permit a unit owner to obtain certain documents, otherwise protected from disclosure, if they concern the unit owner. Indeed, there may be a variety of legal records in Harborview's files to which a unit owner is entitled, such as a letter from the unit owner's own counsel, or a letter from another third party (e.g. an advice letter written by the Maryland Attorney General). But nothing in the legislative history suggests that the provision permits a unit owner to trample protections and privileges held and not waived by another, such as a document that contains the legal advice of Harborview's counsel, or even, a document that contains the personal financial information of another unit owner. The General Assembly is well aware that the attorney-client privilege is a fundamental right under Maryland law, and we discern no intent by the

31

General Assembly, express or implied, to abrogate the attorney-client privilege by its various amendments to RP § 11-116 over the years.

### iii. Attorney-Client Privilege Is Enshrined in Statute

The common law attorney-client privilege was codified over 42 years ago,[11] in what is now Maryland Code, (1973, 2013 Repl. Vol.), § 9-108 of the Courts and Judicial Proceedings Article ("CJP"). The statute provides that "[a] person may not be compelled to testify in violation of the attorney-client privilege." The Court of Appeals has declared that the statute also "prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice." *Zook v. Pesce*, 438 Md. 232, 240-41 (2014) (quoting *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 414 (1998)) (internal quotation marks omitted); *see also CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 202 Md. App. 307, 363 (2011), *aff'd,* 429 Md. 387 (2012).

"The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law." *Bd. of Educ. of Garrett Cnty. v. Lendo*, 295 Md. 55, 63 (1982). Additionally, when undertaking a statutory analysis, the law disfavors

---

[11] The attorney-client privilege was codified in Maryland through the 1973 enactment that created the Courts and Judicial Proceedings Article. 1973 Md. Laws, 1st Sp. Sess., ch. 2 (S.B. 1). The revisor's note to the session law provides, in part:

> This section is new language which does not presently appear in the Code, but is a common law principle that has been long established. *Morris v. State*, 4 Md. App. 252, 254 (1968); *Bris Realty v. Phoenix*, 238 Md. 84, 89-90 (1965).

repeal by implication. *Id.* "[Y]et another cardinal rule of statutory construction is that repeals not expressed will not be found unless demanded by irreconcilability or repugnancy." *Id.* at 62-63. When possible the Maryland courts endeavor to harmonize statutory provisions in a manner that avoids needless conflict between them. *See, e.g., Henriquez v. Henriquez,* 413 Md. 287, 306 (2010) (construing Family Law Article § 12-103 to be in harmony with sections 7-107, 8-214, and 11-110 to avoid an "illogical result").

Here again, absent an express declaration abrogating or carving out an exception to the statutory attorney-client privilege, we decline to imply such abrogation or exception. Rather, realizing that the General Assembly is cognizant of the existence and applicability of the statutory attorney-client privilege, we are compelled to harmonize the two provisions. In so doing, we hold that RP § 11-116 does not abrogate the common law work product doctrine or common law and statutory attorney-client privilege.[12] Further, we agree with the circuit court that reading RP § 11-116 in harmony with the common law "allows a unit owner who is the subject of the written advice of the condominium's legal counsel to inspect that information, provided that it is not protected by the common law attorney-client privilege or the work product doctrine."

---

[12] Harborview and Zalco also argue that an interpretation of RP § 11-116 that requires the production of privileged material or work product to an adverse party in the specific context of litigation involving a condominium creates an absurd result in the face of an attorney's ethical duties under Rules of Professional Conduct 1.4 and 1.6. However, we need not address this contention for the resolution of this matter.

33

**c. Applying the Attorney-Client Privilege and Work Product Doctrine in the Context of an MCA "Books and Records" Request.**

We now examine two distinct categories of documents—the written advice of legal counsel and detailed billing reports from legal counsel—and discern the extent to which the attorney-client privilege and work product doctrine act as brakes on the potentially unfettered disclosures that may otherwise be sought through RP § 11-116. We preface our discussion of these documents with a brief overview of the attorney-client privilege and work product doctrine.

In addition to being hallowed common law principles, the attorney-client privilege and the work product doctrine are also embedded in Maryland law through statute and rule. The attorney-client privilege is "based upon the public policy that an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor." *Zook*, 438 Md. at 241 (quoting *State v. Pratt,* 284 Md. 516, 520 (1979)) (internal quotation marks omitted). Indeed, the attorney-client privilege is one of "the oldest of the privileges for confidential communications known to the common law." *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

"Once the attorney-client privilege is invoked, the trial court decides as a matter of law whether the requisite privilege relationship exists, and if it does, 'whether or not any such communication is privileged.'" *Ehrlich v. Grove*, 396 Md. 550, 574 (2007) (quoting *E.I. du Pont de Nemours & Co.*, 351 Md. at 415). Under Maryland law, the party asserting the privilege bears the burden of establishing whether it applies to evidence in the case.

34

*E.I. du Pont de Nemours & Co.*, 351 Md. at 415. "Although the court makes a legal determination about the existence of a protective privilege, . . . [it] makes a factual determination with respect to satisfaction of the burden." *Catler v. Arent Fox, LLP*, 212 Md. App. 685, 702-03 (citation omitted), *reconsideration denied* (Sept. 3, 2013), *cert. denied sub nom. Blumberg v. Fox*, 435 Md. 502 (2013). "[T]he burden of substantiating non-discoverability . . . cannot be met by conclusory allegations or mere assertions." *Id.* (quoting *Gallagher Evelius & Jones, LLP v. Joppa Drive-Thru, Inc.,* 195 Md. App. 583, 598 (2010)) (internal quotation marks omitted). Where a person asserting privilege has met his or her initial burden that "person may not be compelled to testify in violation of the attorney-client privilege," and this prohibition extends to bar the compelled production of privileged documents. *See, e.g., Ashcraft & Gerel v. Shaw*, 126 Md. App. 325, 350-51 (1999).

Similarly, the work product doctrine "protects from discovery the work of an attorney done in anticipation of litigation or in readiness for trial." *Catler*, 212 Md. App. at 702 (quoting *E.I. du Pont de Nemours & Co.,* 351 Md. at 407). Maryland Rule 2-402(d) provides:

> **Work Product.** Subject to the provisions of sections (f) and (g) of this Rule, a party may obtain discovery of documents, electronically stored information, and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the materials are discoverable under section (a) of this Rule and that the party seeking discovery has substantial need for the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of these materials when the required showing has been made, **the court shall protect against disclosure of the mental**

35

**impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.**

(Emphasis added). In *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, the Court of Appeals recognized that, like the attorney-client privilege, "the party claiming the privilege bears the burden 'to substantiate its non-discovery assertion by a preponderance of the evidence[.]'" 351 Md. at 409 (quoting *Kelch v. Mass Transit Admin.*, 287 Md. 223, 229 (1980)). Determining "whether a document or other tangible thing was 'prepared in anticipation of litigation or for trial' . . . is essentially a question of fact, which, if in dispute, is to be determined by the trial judge following an evidentiary hearing." *Id.* (quoting *Kelch,* 287 Md. at 228).

There are, however, a few key distinctions between the attorney-client privilege and the work product doctrine. We recognized in *Blair v. State* that "[a]lthough the attorney-client privilege and the work product doctrine 'appear to embrace the same concepts of confidentiality and zealous client advocacy, the work product doctrine is separate and distinct from the attorney-client privilege.'" 130 Md. App. 571, 605 (2000) (quoting *E.I. du Pont de Nemours & Co.,* 351 Md. at 406); *see also Pratt v. State,* 39 Md. App. 442, 446 n.2 (1978) ("The work product doctrine . . . is separate from the attorney-client privilege and serves to protect materials from discovery that are not subject to another privilege."), *aff'd,* 284 Md. 516 (1979). Although "the attorney-client privilege is held by the client[,] . . . the protections associated with the work product doctrine belong to the lawyer." *Blair*, 130 Md. App. at 605 (citation omitted). Moreover, the attorney-client privilege is narrowly construed, whereas the work product doctrine is broader in scope. *E.I. du Pont de Nemours*

36

*& Co.*, 351 Md. at 406 (citing *Leonen v. Johns–Manville,* 135 F.R.D. 94, 96 (D.N.J. 1990)). Finally, even if the party asserting protection under the work product doctrine is successful in meeting its burden, the party seeking discovery can gain access to the material by demonstrating "substantial need" and "undue hardship." *See* Md. Rule 2–402(d). Central to the case before us is the Court of Appeals's direction that in examining the application of either privilege or protection, we look to the nexus between the creation of the material and the prospect of litigation. *E.I. du Pont de Nemours & Co.*, 351 Md. at 410 (quoting *APL Corp. v. Aetna Cas. & Sur. Co.*, 91 F.R.D. 10, 15 (D. Md. 1980)).

### i. The Written Advice of Legal Counsel

We can envision no more fundamental an example of a confidential communication between an attorney and client than written legal advice transmitted from the attorney directly to the client. Indeed, as the circuit court noted in its memorandum opinion, "[b]oth parties hav[e] admitted that the attorney-client privilege is applicable to the written advice of legal counsel." We acknowledge that the attorney-client privilege is not an absolute bar, as it is subject to waiver, both express and implied. *See Fraidin v. Weitzman*, 93 Md. App. 168, 228 (1992) (citing *Pratt,* 284 Md. at 521). However, Dr. Clark does not argue that Harborview and Zalco waived the privilege with regard to the written advice of legal counsel; instead, he solely argues that he is entitled to the documents pursuant to RP § 11-116. Moreover, Dr. Clark's trial testimony confirms he seeks written legal advice that concerns not only the "prospect of litigation[,]" *E.I. du Pont de Nemours & Co.*, 351 Md. at 410, but the ongoing administrative actions and civil litigation between him and Harborview.

Having already determined, *supra,* that RP § 11-116 does not abrogate the attorney-client privilege or work product doctrine, we observe that especially where a condominium unit owner seeking the production of the written advice of legal counsel is engaged in ongoing litigation against the condominium's governing association, "the pursuit of truth and justice" does not compel the production of otherwise privileged material.[13] *See Newman v. State,* 384 Md. 285, 301 (2004). Rather, the facts in the matter *sub judice* weigh in favor of the "public interest[] . . . need to promote candor in communications between attorneys and their clients." *See id.* at 302. Therefore, we affirm the declaratory judgment of the circuit court and hold that the written advice of legal counsel, protected by the attorney-client privilege, is not discoverable under RP § 11-116 absent waiver. [14]

---

[13] We note, that although this interpretation forecloses the discovery of documents between parties who are directly adverse absent waiver, unit owners would remain able to obtain the written advice of counsel in cases in which they are a co-plaintiff or co-defendant with the Council of Unit Owners or in matters against non-unit owners in which the Council undertakes the prosecution of a claim or defense on behalf of all unit owners and affecting the requesting owner or unit.

[14] The circuit court did not decide, nor was it necessary to decide, whether the written advice of counsel was also protected by the work product doctrine. We note that the work of an attorney done in anticipation of litigation is also protected from discovery via RP § 11-116 absent waiver or a showing sufficient to satisfy the requirements of Maryland Rule 2-402(d). Under Maryland Rule 2-402, generally, a party may obtain discovery regarding any matter that is relevant to the subject matter involved in the action and not otherwise privileged or protected by the work product doctrine. However, subsection (d) of the rule provides for discovery of documents otherwise protected upon a showing that the requestor has a "substantial need for the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

### ii. The Detailed Billing Reports

In seeking the disclosure of the detailed billing reports, Dr. Clark asserts his significant interest as a unit owner in the financial transactions and decisions of Harborview. As a unit owner, Dr. Clark owns an undivided percentage interest in the common elements and is correspondingly responsible to pay a percentage of Harborview's common expenses. RP § 11-107. Pursuant to the MCA and Harborview's governing documents, Harborview may levy assessments and impose liens on unit owners for unpaid common expenses. RP § 11-110. Those common expenses include legal expenses.[15]

Dr. Clark avers that the circuit court was correct in determining that Harborview and Zalco failed to meet their burden to establish that either the attorney-client privilege or the work product doctrine are applicable to the detailed billing reports of legal counsel. Dr. Clark contends that rather than attempting to meet the initial burden—by, for example, introducing redacted copies of the detailed billing reports—Harborview and Zalco waited to assert the impossibility of satisfying their burden in a post-trial motion. Thus, Dr. Clark argues that Harborview and Zalco should not now be allowed to re-open the case after having failed to prove its defense in trial.

Harborview maintains that Dr. Clark's interest in the disclosure of legal expenses affecting the financial well-being of Harborview, and thereby the unit owners, was satisfied

---

[15] As a poignant example of the scale of this expense in recent years, Dr. Clark notes that the Harborview Condominium Budget Narrative for 2013 lists legal expenses in the amount of $890,950.00. Dr. Clark contends this is a significant expense for all of the Harborview unit owners, but Harborview and Zalco maintain that a sizable portion of the amount was incurred defending against the multiple actions initiated by Dr. Clark and his common interest agreement partner, James Ancel.

39

through the production of legal invoices. Regarding the detailed billing reports received from legal counsel, Harborview and Zalco contend that they met the burden to prove that both the attorney-client privilege and the work product doctrine are applicable.

During the October 8, 2013, trial, Harborview and Zalco introduced a sample detailed billing report as an exemplar. This exhibit (unrelated to the matter between these parties) contained billing detail to the tenth of an hour and included, among other things, the name of the attorney who performed the work and a brief description of the nature of the work. Mr. Fabreziani, former property manager employed by Zalco to manage Harborview, testified that he had received detailed billing reports from counsel for Harborview and that "[i]t would have an accounting of all the details in terms of times, what the attorneys were working on, [and] documents that were prepared." President of the Harborview Council of Unit Owners, John Cochran, also testified that he received detailed billing reports from counsel for Harborview. He further testified that, in his experience as an attorney, a detailed billing report is "a communication to the client that says to the client what I've been doing, what my mental impressions are, what work I've been doing[.]" In an effort to avoid inadvertent disclosure or waiver, Harborview did not introduce any specific detailed billing reports into evidence to show that the attorney-client privilege or work product doctrine applied.[16]

---

[16] Because Harborview and Zalco's motions to stay the circuit court's October 16, 2013, order before both the circuit court and this Court were denied, the question of what portion, if any, of the detailed billing reports may have been privileged is largely academic. Nevertheless, the parties dispute on appeal whether the actual privileged records could have been produced *in camera* to the court and opposing counsel. The Court of Appeals has recognized the dilemma presented by allowing opposing counsel to view allegedly

In *Maxima Corp. v. 6933 Arlington Development Limited Partnership*, we stated:

"[a]ttorneys' bills are generally not protected by the attorney-client privilege; and to the

extent that portions of a bill might have been privileged, [a party's] blanket assertion [i]s

inadequate." 100 Md. App. 441, 455 (1994). Addressing the level of detail contained in

an attorney's billing report, we quoted the Ninth Circuit, stating:

---

attorney-client privileged documents submitted *in camera*, where it was unclear whether the court had determined that the privilege applied to those documents. *See Ehrlich*, 396 Md. at 574. A workable solution already exists through the modalities by which the courts of Maryland have employed *in camera* inspection. "If the court determines that the defendant has established the need to inspect the material at issue, then 'the court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restrictions as the court requires to protect the records' confidentiality.'" *Fields v. State*, 432 Md. 650, 667 (2013) (quoting *Zaal v. State,* 326 Md. 54, 87 (1992)). We recognize that where "an *in camera* inspection is an intrusion on . . . attorney-client privilege and the work product doctrine, then, clearly, expanded *in camera* review is a more serious intrusion on those privileges because opposing counsel is being made privy to allegedly privileged information." *Ehrlich*, 396 Md. at 571. As the Second Circuit observed in *Chase Manhattan Bank v. Turner & Newall, PLC*,

> If opposing counsel is allowed access to information arguably protected by the privilege before an adjudication as to whether the privilege applies, a pertinent aspect of confidentiality will be lost, even though communications later deemed to be privileged will be inadmissible at trial.
>
> * * *
>
> Moreover, attorneys cannot unlearn what has been disclosed to them in discovery. Some of the economies gained by the practice of pre-adjudication disclosure may thus be offset by later proceedings seeking to unscramble the effects of the disclosure of materials subsequently held to be privileged.

964 F.2d at 165. In cases like the one *sub judice*, an expanded *in camera* proceeding, "one in which counsel for [both parties] participate or permitting the review of the records by counsel in their capacity as officers of the court," *Zaal*, 326 Md. at 86, is often an unsatisfactory resolution. This is, in large part, why the Court of Appeals recognized in *Zaal* and *Fields* that *in camera* review by a judge without the presence of counsel is sometimes warranted.

> [T]he identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege. However, correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of the law, fall within the privilege.

*Id.* at 456-57 (quoting *Clarke v. Am. Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir. 1992)).

In the instant case, the circuit court found that Harborview and Zalco failed to carry their burden of showing that attorney-client privilege applied to all or portions of the requested detailed billing reports, and stated: "[Harborview and Zalco's] blanket assertion is insufficient to overcome the presumption that information contained in detailed billing reports is generally unprotected." (citing *Maxima Corp., supra*, 100 Md. App. at 457). We affirm the court's ruling. Indeed, as we have previously stated, "a finding that information in attorneys' bills is within the attorney-client privilege is the exception and not the general rule." *Id.* at 457-58.

Harborview and Zalco also contend that their detailed billing reports are protected by the broader work product doctrine. The threshold for application of the work product doctrine is that the material must have been prepared "in anticipation of litigation or in readiness for trial." *Catler*, 212 Md. App. at 702 (quoting *E.I. du Pont de Nemours & Co.,* 351 Md. at 407). Based on the timing of the requests and ongoing litigation between the parties, we may infer that this is the case for at least some of the detailed billing reports. However, we have recognized two categories of attorney work product: fact and opinion. *Blair*, 130 Md. App. at 607-08 (citing *Hickman v. Taylor,* 329 U.S. 495, 507-08 (1947);

42

*E.I. du Pont de Nemours & Co.,* 351 Md. at 407-08; *Nutramax Labs., Inc. v. Twin Labs.*

*Inc.*, 183 F.R.D. 458, 462 (D. Md. 1998)). Fact work product consists of generally those

"materials gathered by counsel (or at counsel's instructions) in preparation of trial." *Id.* at

607 (quoting Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 904(A) (3d ed.

1999)). Opinion work product concerns the attorney's mental processes. *See E.I. du Pont*

*de Nemours & Co.,* 351 Md. at 407-08.

The circuit court found that Harborview and Zalco did not present sufficient

evidence to establish that the detailed billing reports did, in fact, contain facts developed

by their attorneys' efforts in preparation of a case or opinions the attorneys had formed

about any phase of the litigation. Accordingly, we hold that without a showing that either

the attorney-client privilege or the work product doctrine applies to bar the production of

the requested detailed billing reports, the circuit court correctly declined to apply those

privileges to the reports otherwise properly available to Dr. Clark as financial records

maintained by the governing body of the condominium under RP § 11-116.

**II.**

**The Availability of Injunctive Relief to Enforce**
**an MCA "Books and Records" Request.**

We review the exercise of the circuit court's discretion to grant or deny a request

for injunctive relief under an "abuse of discretion" standard. *El Bey v. Moorish Sci. Temple*

*of Am., Inc.*, 362 Md. 339, 354-55 (2001) (citing *Colandrea v. Wilde Lake Cmty. Ass'n,*

*Inc.*, 361 Md. 371, 394 (2000)); *see also Maryland Comm'n on Human Relations v. State*

*Dep't of Health & Mental Hygiene v. Baltimore Cnty.,* 281 Md. 548, 554 (1977); *Downey*

43

*Commc's, Inc.,* 110 Md. App. 493, 521 (1996). Where an appeal concerns the issuance of a permanent injunction, we are guided by the principles of injunctive relief:

> An injunction is a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience. Thus, injunctive relief is a preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs.

*El Bey*, 362 Md. at 353-54 (emphasis in original) (citations and internal quotations marks omitted). Thus, the pertinent question presented when reviewing the grant of a permanent injunction is "whether [appellee] produced evidence that [appellant's] conduct caused, or was likely to cause, . . . the type of [irreparable] harm necessary to justify the court's issuance of injunctive relief." *Id.* at 355.

In *Coster v. Department of Personnel,* we relied on American Jurisprudence to require the prospect of irreparable injury before granting an injunction:

> A court of equity reserves its injunctive process for the protection of property or other rights against actual or threatened injuries of a substantial character which cannot be adequately remedied in a court of law. That is to say, the jurisdiction or power to grant injunctive relief should be exercised only when intervention is essential to effectually protect property or other rights, of which equity will take cognizance, against irreparable injuries. The very function of an injunction is to furnish preventive relief against irreparable mischief or injury, and the remedy will not be awarded where it appears to the satisfaction of the court that the injury complained of is not of such character. Suitors may not resort to a court of equity to restrain acts, actual or threatened, merely because they are illegal or transcend constitutional powers, unless it is apparent that irremediable injury will result. The mere assertion that apprehended acts will inflict irreparable injury is not enough. The complaining party must allege and prove facts from which the court can reasonably infer that such would be the result.

36 Md. App. 523, 525-26 (1977) (quoting 42 Am. Jur. 2d *Injunctions* §§ 48, 49).

Importantly, mere allegations or arguments by a party that it will suffer irreparable damage

44

are insufficient bases for injunctive relief; "facts must be adduced to prove that [the requesting party's] apprehensions are well-founded." *El Bey*, 362 Md. at 356 (citing *Smith v. Shiebeck*, 180 Md. 412, 421 (1942); *Mayor & Council of Salisbury v. Camden Sewer Co.,* 135 Md. 563, 573 (1920)).

Here, the dispute settlement mechanism under the MCA provides:

> If any unit owner fails to comply with this title, . . . the unit owner may be sued for damages caused by the failure or for injunctive relief, or both, by the council of unit owners or by any other unit owner.

RP § 11-113(c). Thus, the MCA contemplates injunctive relief as an appropriate vehicle for enforcing the rights and obligations it creates. Because the failure to comply with a unit owner's rights under RP § 11-116 "cannot be readily, adequately, and completely compensated for with money," *see Coster*, 36 Md. App. at 525-26 (quoting 42 Am. Jur. 2d *Injunctions* § 49), injunctive relief may be granted "to effectually protect [the] rights" of the party requesting equitable relief, *see id.* (quoting 42 Am. Jur. 2d *Injunctions* § 48). Therefore, absent a sufficient showing by Harborview and Zalco of the applicability of a privilege against disclosure, Dr. Clark is entitled to the production of detailed billing reports as financial documents maintained by Harborview and Zalco pursuant to RP § 11-116, and to injunctive relief to enforce that production when it has been denied.

Contrastingly, the circuit court's order enjoining Harborview and Zalco to produce any future e-mail correspondence between them concerning Harborview is not supported by any reasonable apprehension of irreparable harm. As all parties acknowledge, the management contract between Harborview and Zalco expired on December 31, 2012. A separate management company has since taken over operations at Harborview. The record

45

does not contain any indication that communications between Harborview and Zalco—regarding the financial well-being of Harborview—will continue in any form. As such, this request is likely moot and inappropriate for an award of permanent injunctive relief. *See El Bey*, 362 Md. at 355 (citing *Maryland–Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 615 (1978)) ("Injunctive relief normally will not be granted unless the petitioner demonstrates that it will sustain substantial and irreparable injury as a result of the alleged wrongful conduct."). Accordingly, we vacate the order of the circuit court awarding specific performance directing Harborview and Zalco to produce any future e-mail correspondence and enjoining them from refusing. However, with regard to the remaining orders for specific performance and injunctive relief, we cannot conclude that the circuit court abused its discretion.

### III.

### The Exclusion of Harborview's Expert Witness

Harborview maintains that its accounting expert was prepared to opine, *inter alia*, that detailed billing reports of legal counsel are not part of the financial books and records that a condominium association is required to keep in accordance with good accounting practices. The events leading to the court's decision to exclude this testimony began on March 13, 2013, when the pretrial scheduling order was issued. According to the order, Harborview and Zalco were to designate their expert witnesses by June 11, 2013, and trial was set for October 8, 2013. Harborview maintained that it had not received a copy of the scheduling order and was unaware of the deadline. Several days after Harborview failed to meet the deadline for the identification of expert witnesses, Dr. Clark served

46

interrogatories on June 13, 2013, asking Harborview to identify its expert witnesses. On July 15, 2013, Harborview responded to those interrogatories and identified Mr. Gehrig Cosgray, CPA, as an expert witness. Dr. Clark then moved, on August 7, 2013, to exclude Mr. Cosgray as an expert witness due to Harborview's failure to comply with the scheduling order.

On September 12, 2013, Dr. Clark identified his rebuttal expert witnesses, and on September 26, 2013, Dr. Clark noticed Mr. Cosgray's deposition. The same day Dr. Clark noticed the deposition, the circuit court summarily granted his motion to exclude Mr. Cosgray as an expert witness. Nevertheless, Dr. Clark deposed Mr. Cosgray on October 1, 2013. At trial, Dr. Clark did not introduce any expert testimony.

Harborview contends that the circuit court erred by excluding the testimony of its expert witness. Harborview maintains that despite not receiving the scheduling order and thereby, admittedly, missing the deadline for the disclosure of expert witnesses, it substantially complied with the order by notifying Dr. Clark of its expert witness a month after the deadline and almost three months before trial. Moreover, it argues that Dr. Clark was able to identify his own rebuttal expert witnesses on September 12, 2013, and that he deposed Mr. Cosgray prior to trial. Harborview asserts that although the appropriate sanction for a party's failure to comply with a discovery order is a matter of discretion for the circuit court, *Livingstone v. Greater Washington Area Anesthesiology & Pain Consultants,* 187 Md. App. 346, 388 (2009) (citing *Maddox v. Stone*, 174 Md. App. 489, 501 (2007)), the court's failure to exercise discretion requires reversal. We do not agree that the court's decision is so manifestly erroneous as to warrant reversal.

47

The circuit court must enter a scheduling order in most civil actions pursuant to Maryland Rule 2-504(a)(1). In *Dorsey v. Nold,* 362 Md. 241, 255-56 (2001), the Court of Appeals stated:

> The principal function of a scheduling order is to move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur.
>
> * * *
>
> Rule 2-504 is not a discovery rule. It is not included in the Title 2, Chapter 400 rules on discovery and, except as provided in § (b)(2)(A), is not intended either to enlarge or constrict the scope of discovery. Its function, to the extent it references discovery in § (b)(1), is to provide for the setting of time limits on certain discovery events; it is, in that regard, a rule of timing, not of substance.

In *Maddox v. Stone*, this Court, in reviewing the above language, concluded:

> [A]lthough scheduling orders should not be applied in a manner that is "unyieldingly rigid," litigants must make good faith and reasonable efforts to substantially comply with the court's deadlines[.]

174 Md. App. at 499 (citing *Naughton v. Bankier,* 114 Md. App. 641, 653 (1997). We have deemed substantial compliance with a scheduling order to be sufficient where the opposing party has not suffered prejudice. *See, e.g.*, *Wormwood v. Batching Sys., Inc.,* 124 Md. App. 695, 702-05 (1999). Still, the overriding tenet persists that, "[t]he decision to admit or exclude 'expert' testimony is within the broad discretion of the trial court and that decision will be sustained on appeal unless it is shown to be manifestly erroneous." *Kleban v. Eghrari–Sabet,* 174 Md. App. 60, 61 (2007) (quoting *Wood v. Toyota Motor Corp.,* 134 Md. App. 512, 520 n.8 (2000)) (internal quotation marks omitted).

In the instant case, the order of the circuit court excluding the expert testimony of Mr. Cosgray summarily states:

> Upon consideration of the Plaintiff's Motion to Exclude Expert Testimony of Gehrig Cosgray, CPA (#37), Defendant's Opposition to Plaintiff's Motion to Exclude Expert Testimony of Gehrig Cosgray, CPA (#37/1) and Plaintiff's Reply in Support of Motion to Exclude Expert Testimony of Gehrig Cosgray, CPA (#37/2), it is this 20th day of September 2013, by the Circuit Court for Baltimore City, hereby
> **ORDERED** that, Plaintiff's Motion to Exclude Expert Testimony of Gehrig Cosgray, CPA (#37) is **GRANTED.**

There is no accompanying memorandum, and the record reveals that the court did not hold a hearing on the motion. For those reasons, Harborview asserts that it cannot be discerned from the summary exclusion of its expert witness whether the circuit court exercised proper discretion or granted the exclusion based on a predetermined position that exclusion was mandatory. *See Gunning v. State,* 347 Md. 332, 351 (1997) ("[A] judge's unyielding adherence to [a] predetermined position amounts to a . . . failure to properly exercise discretion."); *Maus v. State,* 311 Md. 85, 108 (1987) ("When a court must exercise discretion, failure to do so is error, and ordinarily requires reversal."). However, the record reveals that the court had ample time to consider all parties' filings and arguments.

Additionally, it appears that Mr. Cosgray's expert testimony was to be, in large part, his legal opinion on the scope of "books and records" under RP § 11-116. Harborview designated Mr. Cosgray as its expert witness in its July 15, 2013, answers to interrogatories. Those answers, which were attached to Appellee's motion to exclude, provided, in pertinent part:

> Mr. Cosgray is expected to testify based on his review of the relevant documents and depositions and his familiarity with Section 11-116 of the

49

Maryland Real Property Article that the books and records Harborview is required to maintain and provide for inspection do not include the detailed billing reports prepared by outside counsel for Harborview and are submitted to Harborview for purposes of communicating itemized descriptions of legal work performed for Harborview by its outside counsel.[17]

"Witnesses (whether lay or expert) generally may not testify to their conclusions on legal issues, because their opinions would not be helpful to the court or the jury." 6 Lynn McLain, *Maryland Evidence, State & Federal* § 701:7, at 864-65 (3d. ed.).

In *Burch v. Prudential Insurance Company of America*, 184 Md. 664, 671 (1945), the Court of Appeals considered the propriety of witness testimony regarding the legal effect of bookkeeping practices. In that case, the appellant brought an action upon a special agency contract to collect renewal commissions on life insurance premiums. *Id.* at 666-67. The contract provided for "the payment of commissions, with respect to business procured by the agent personally, on all premiums and considerations collected by him and paid to the company in cash during the continuance of the contract." *Id.* The policy in question, however, contained a provision stating that "upon proof that the insured had become totally and permanently disabled before the age of sixty, [the insurer] would waive the payment of certain premiums otherwise payable under this policy." *Id.* at 673 (internal quotation marks omitted). The sole question presented to the Court of Appeals was whether this waiver of premium payments constituted a discontinuance of payment or should be deemed constructive payment for the purpose of the agency contract and commission payments. *Id.* The appellant argued that the trial court erred in excluding

---

[17] The subject of Mr. Cosgray's testimony was provided to the circuit court again through proffer—using substantially similar language—at the October 9, 2013, hearing.

testimony as to bookkeeping practices and custom and usage among insurance companies regarding premiums waived during disability. *Id.* The Court of Appeals disagreed, stating that questions calling for conclusions regarding the legal effect of company bookkeeping practices "were not designed to elicit any new facts as to that practice, but merely called for an expression of opinion upon a point which . . . was for the court to decide" *Id.* at 671.

We are presented with a similar circumstance. Just as the construction of an unambiguous contract is a matter of law to be decided by the court, *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 480 (2015) (citations omitted), so too is the construction of a statute such as RP § 11-116, *see Davis v. Slater,* 383 Md. 599, 604 (2004) (citations omitted) (stating that interpreting the Maryland Code is a matter of law). In the matter before us, we cannot conclude that the circuit court either abused or failed to exercise its discretion in excluding the testimony of Harborview's expert witness.

## IV.

## Cross-appeal

In his cross-appeal, Dr. Clark argues that the circuit court erred in conducting its statutory construction analysis and that it erred in determining that the provisions of RP § 11-116 can be read in harmony with the attorney-client privilege and the work product doctrine. We have already addressed these contentions above. The arguments advanced on cross-appeal are not otherwise distinct.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND VACATED IN PART. ORDER AWARDING SPECIFIC PERFORMANCE**

51

**DIRECTING APPELLANTS/CROSS-APPELLEES TO PRODUCE ANY FUTURE E-MAILS CONCERNING THE FINANCIAL WELL-BEING OF HARBORVIEW AND ENJOINING THEM FROM REFUSING TO PRODUCE SUCH FUTURE E-MAILS VACATED. ALL OTHER ORDERS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE DIVIDED EQUALLY AMONG THE PARTIES.**